Lawrence A. UZZELL and Robert Lane Arrington, Individually, and upon behalf of all others similarly situated, Plaintiffs,

and

William Gwynne Head, III, and Richard Jeffrey Kania, Individually, and upon behalf of all others similarly situated, Intervening Plaintiffs,

and

Myra Susan Creed, Katharyn Luanne Holshouser, Jay Allen Kania, Sue Ann Kania, Myra Ann Mandeville, Patricia

Dawn McKissick, Michael J. Morris, John Malcolm Overton, Edward B. Munyer, Michael L. Walker, and Timothy E. Walker, Individually, and upon behalf of all others similarly situated, Intervening Plaintiffs,

and

Donald Lewis Elmore, II, Individually, and upon behalf of all others similarly situated, Intervening Plaintiff,

v.

William C. FRIDAY, Individually, and as President of the University of North Carolina; Christopher Columbus Fordham, Individually, and as Chancellor of the University of North Carolina at Chapel Hill; Kevin Monroe, President of the Student Body of the University of North Carolina at Chapel Hill; The Board of Trustees of the University of North Carolina at Chapel Hill; and the Board of Governors of the University of North Carolina, Defendants,

and

Jessie Cureton, Jr., and Greg Cranford, Intervening Defendants,

and

Kevin Monroe, James J. Exum, Sherrod Banks, and Kevin D. Jones, Intervening Defendants.

Civ. No. C–74–178–D.

United States District Court, M.D. North Carolina, Durham Division.

Aug. 23, 1984.

1504

Richard L. Voorhees, Gastonia, N.C., for plaintiffs and all intervening plaintiffs.

Elizabeth C. Bunting, Asst. Atty. Gen., Andrew A. Vanore, Jr., Deputy Atty. Gen., Raleigh, N.C., for defendants Friday, Fordham, Monroe, Board of Trustees, and Board of Governors of the University of North Carolina.

Napoleon Williams, NAACP Legal Defense Fund, New York City, and Julius Levonne Chambers, James C. Fuller, Jr., Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P.A., Charlotte, N.C., for all intervening defendants.

## MEMORANDUM OPINION

BULLOCK, District Judge.

After consideration of the issues in this case on four separate occasions by the United States Court of Appeals for the Fourth Circuit, and once by the United States Supreme Court (another petition for certiorari was denied), the case is again before the district court pursuant to remand from the court of appeals for the taking of evidence and the development of a full record. After remand, this court held several hearings and conferences with counsel for the parties for the purposes of resolving certain preliminary matters and expediting the compilation of a complete record, culminating in the trial of this case before the court sitting without a jury. The case is now before the court for the entry of findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I.

### STATEMENT OF THE CASE

The court will first review briefly the history of this case, examined in greater detail in other decisions in this litigation.

*Uzzell v. Friday,* 625 F.2d 1117, 1119–20 (opinion of Winter, C.J., for the court), 1121–23 (Widener, J., dissenting) (4th Cir.), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). The suit was commenced on June 13, 1974, by two students at the University of North Carolina at Chapel Hill (UNC at Chapel Hill) seeking declaratory and injunctive relief against three practices of UNC at Chapel Hill: (1) subsidization of a campus organization, the Black Student Movement (BSM), which until after the suit was filed excluded whites from membership; (2) a provision in the Student Constitution [1] which requires that up to two minority race students be appointed to the student legislature, the Campus Governing Council (Council), if a like number of such students is not elected to the Council; and (3) the predecessor to a provision in the Instrument of Student Judicial Governance (Instrument),[2] which establishes a statutory scheme giving student defendants the right to require that a majority of the judges on an individual panel of the student honor court, named the Undergraduate Court, be of his race or sex. All three practices were alleged to violate the fourteenth amendment and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the first practice—BSM funding—Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.,* as well.

The persons against whom the suit was initially brought (hereinafter referred to as the original Defendants) included student and administrative officials of UNC at Chapel Hill and officials of the University of North Carolina system (UNC), comprising sixteen institutions of higher education, including UNC at Chapel Hill. This court later granted intervention to two members of BSM (hereinafter referred to as intervening Defendants). Additional Plaintiffs have subsequently been granted leave to intervene in order to avoid mootness and

---

**1.** Article 1, § 1.D of the Student Constitution, set forth *infra* note 7.

**2.** Section IV.C.2 of the Instrument, pertinent parts of which are set forth *infra* notes 9, 10. The predecessor provision, which was found in

the Student Constitution, differed in significant respects from the current provision in the Instrument. *See infra* Findings of Fact ¶ 17. The superseding Instrument provision is named in the two complaints in intervention, filed after adoption of the Instrument.

various persons have been substituted as Defendants.[3]

On September 16, 1975, this court per then Chief Judge Eugene A. Gordon granted summary judgment for all Defendants on the grounds that the claim concerning BSM had been mooted by the subsequent admission of whites and that the other two claims failed to state a cause or controversy under Article III of the Constitution. *Uzzell v. Friday,* 401 F.Supp. 775 (M.D.N.C.1975). On appeal a three-judge panel of the United States Court of Appeals for the Fourth Circuit affirmed this court's ruling regarding BSM, but reversed its ruling on the other two claims and remanded with instructions to enter summary judgment for Plaintiffs. *Uzzell v. Friday,* 547 F.2d 801 (4th Cir.1977). A sharply divided court of appeals sitting *en banc* confirmed this decision. *Uzzell v Friday,* 558 F.2d 727 (4th Cir.1977) (4–3 decision) (minority concurred in ruling on BSM claim but dissented from ruling on other two claims).

On July 3, 1978, the Supreme Court vacated the *en banc* judgment of the Fourth Circuit and remanded the case for further consideration in light of its then recent decision in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) [hereinafter cited as *Bakke* ]. *Friday v. Uzzell,* 438 U.S. 912, 98 S.Ct. 3139, 57 L.Ed.2d 1158 (1978). On February 2, 1979, the Fourth Circuit sitting *en banc* for the second time in the case reaffirmed its previous decisions, again with a strong dissent. *Uzzell v. Friday,* 591 F.2d 997 (4th Cir.1979) (4–3 decision).

Within several months two new appointees to the court of appeals were commissioned. Thereafter, on November 9, 1979, the newly constituted court of appeals on its own motion withdrew its second *en banc* decision on the grounds that a revision in a section of the Omnibus Judgeship Act, 28 U.S.C. § 46, unknown to the court at the time, had made it improper for Senior Circuit Judge Bryan to have sat on the second *en banc* panel. While a petition for review of the court of appeals' action, subsequently denied, was pending before the Supreme Court, the Fourth Circuit issued a third *en banc* decision in this case, again a divided one, on May 12, 1980. *Uzzell v. Friday,* 625 F.2d 1117 (4th Cir.) (5–3 decision), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). It affirmed this court's judgment of September 16, 1975, with respect to BSM, but vacated the judgment with respect to the minority provisions governing the Council and Undergraduate Court, and remanded the case for further development of the record. *Id.* at 1121. It is pursuant to this remand that trial of the instant litigation was held before this court.

The principal purpose of the remand is to provide "[t]he university ... the opportunity to justify its regulations so that the district court can apply the *Bakke* test: is the classification necessary to the accomplishment of a constitutionally permissible purpose?" [4] *Id.* In applying the *Bakke* test this court is directed to take into consideration the principles set forth in the dissenting opinions to the first two *en banc* Fourth Circuit decisions in this case. *Id.* Other issues upon which this court is to make findings of fact and conclusions of law include whether this case has been mooted by the graduation of Plaintiffs from UNC at Chapel Hill, *id.* (adopting 591 F.2d at 1001 [Winter, C.J., dissenting]), and whether Plaintiffs have standing to assert their claims, *see id.* (adopting 558

---

**3.** *See infra* note 5 for a complete listing of litigants.

**4.** Plaintiffs have moved for dismissal of intervening Defendants on the grounds that the quoted language and similar statements from the remand decision limit participation in post-remand proceedings to original Defendants. The court finds Plaintiffs' contention unpersuasive. At no point in the remand decision does the Fourth Circuit expressly state that intervening Defendants be dismissed, as it could have if it so intended. Furthermore, intervening Defendants can provide information useful in applying the *Bakke* test. Their participation would therefore appear to be encompassed by the Fourth Circuit's expressed intent that this court develop a complete record on remand. *See Uzzell v. Friday,* 625 F.2d at 1121, *cert. denied,* 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808. Plaintiffs' dismissal motion shall accordingly be denied.

F.2d at 727–28 [Winter, C.J., concurring and dissenting]).

## II.

### FINDINGS OF FACT

With the broad scope of the Fourth Circuit's remand in mind, the court makes the following findings of fact:

A. *Parties.*[5]

1. Plaintiffs, who are of the white race, are current and former undergraduate, graduate, and professional students in good standing at UNC at Chapel Hill. At all times throughout this litigation at least one Plaintiff has been enrolled as such a student. At all times following the intervention of Richard Jeffrey Kania in June 1978, at least one of the enrolled Plaintiffs has been an undergraduate. Plaintiffs currently enrolled include Donald Lewis Elmore, II.

2. Original Defendant Board of Governors of UNC is a body established by the laws of North Carolina and charged by such laws with chief responsibility for the supervision and management of all programs and activities at UNC and its sixteen constituent institutions, including the activities subject to the minority provisions at issue here. N.C.Gen.Stat. § 116–3, –11; Code of UNC § 203.

3. Original Defendant President of UNC is established by the laws of North Carolina as the chief administrative and executive officer of UNC. N.C.Gen.Stat. § 116–14; Code of UNC § 501. As such, the President of UNC is responsible to the Board of Governors for carrying out its policies regarding UNC and its sixteen constituent institutions. The President of UNC has been delegated no authority per se and has in fact exercised no authority over adoption, retention, or amendment of the provisions mandating minority representation in the Council and Undergraduate Court at UNC at Chapel Hill. *See* Code of UNC § 502D(3). He does, however, possess indirect authority over these provisions through his supervisory authority over the Chancellor of UNC at Chapel Hill. *See* Code of UNC §§ 501C(7), 502B(3). William C. Friday has occupied the post of President of UNC from 1956 to the present.

4. Original Defendant Board of Trustees of UNC at Chapel Hill is a body established by the laws of North Carolina and responsible to the Board of Governors for promoting the development of that institution and performing such other duties with respect to that institution as the Board of Governors of UNC prescribes. N.C.Gen. Stat. § 116–31, –33; Code of UNC § 403; Delegations of Duty and Authority to Boards of Trustees (July 7, 1972).

5. Original Defendant Chancellor of UNC at Chapel Hill is established by North Carolina law as the administrative and executive head of that institution. N.C.Gen. Stat. § 116–34; Code of UNC § 502. As

---

5. A review of the numerous changes in participants in this litigation would be useful at this point. The Plaintiffs named in the original complaint, filed June 13, 1974, were Lawrence A. Uzzell and Robert Lane Arrington. Thereafter, the following successive groups of students intervened as Plaintiffs, as those already in the case graduated: on June 9, 1978, William Gwynne Head, III, and Richard Jeffrey Kania; on June 14, 1979, eleven students including Jay Allen Kania; and on July 5, 1983, Donald Lewis Elmore, II.

The original Defendants named in the complaint were William C. Friday, President of UNC; Nelson Ferebee Taylor, Chancellor of UNC at Chapel Hill; Claiborne Jones, Vice Chancellor of UNC at Chapel Hill; Marcus Williams, President of the Student Body of UNC at Chapel Hill; Timothy Dugan, Treasurer of the Student Body of UNC at Chapel Hill; the Board of Trustees of UNC at Chapel Hill; and the Board of Governors of UNC. On December 10, 1980, Christopher Columbus Fordham was substituted for Taylor. On January 14, 1981, John Temple, Bob Sanders, and Rochelle Tucker were substituted for C. Jones, Williams, and Dugan, respectively. On October 20, 1983, the parties stipulated to the dismissal of Temple and Tucker, and Sanders has been replaced automatically by Kevin Monroe under Fed.R.Civ.P. 25.

The initial intervening Defendants, granted leave to intervene on October 22, 1974, were BSM officers Algenon L. Marbley and Robert L. Wynne, II. As a result of graduations, Jessie Cureton, Jr., and Greg Cranford were substituted as intervening Defendants on November 13, 1980; and on September 16, 1983, Kevin Monroe, James J. Exum, Sherrod Banks, and Kevin D. Jones intervened as intervening Defendants.

such, he is responsible to the Board of Governors and Board of Trustees of UNC at Chapel Hill for carrying out their policies relating to that institution. Among his broad powers, he has full authority in regulation of student affairs and in matters of student discipline, including the minority provisions at issue here. *See* Code of UNC § 502D(3); Delegations of Duty and Authority to Boards of Trustees § XII (July 7, 1972). In accordance with long-standing practice at UNC at Chapel Hill and as authorized by law, Code of UNC § 502D(3), the Chancellor has delegated substantial authority over these two provisions to faculty committees, administrative and other officers, and agencies of student government. Christopher Columbus Fordham has served as Chancellor of UNC at Chapel Hill from March 1980 until the present. Former original Defendant Nelson Ferebee Taylor had been Chancellor from February 1972 until January 1980.

6. Original Defendant President of the Student Body of UNC at Chapel Hill, exercising authority delegated to him by the Chancellor, is the chief executive officer of the student government at UNC at Chapel Hill. As such, he has broad authority to, among other things, enforce enactments of the Council, represent the student government, and make appointments, including those mandated by the minority provisions at issue here. The Student Body President at the time of trial was Kevin Monroe.[6] In addition to being an original Defendant by virtue of his office, Kevin Monroe has intervened as an intervening Defendant. He is participating actively in this litigation only as an intervening Defendant representing BSM.

---

**6.** As indicated *supra* note 5, Kevin Monroe has been substituted automatically for Bob Sanders as Student Body President. *See* Fed.R.Civ.P. 25(d)(1). The court has amended the caption accordingly.

**7.** This section provides:

*Minority Representation.* To ensure that there be a protective representation of minority races and both sexes on the Council, at all times there shall be at least two Councillors of a minority race within the Student Body (if any), two male Councillors, and two female Councillors. If at any time the requirements

---

7. Intervening Defendants, who are of the black race, had been prior to the time of trial or were at such time students at UNC at Chapel Hill and student members of BSM. Intervening Defendants enrolled at the time of trial included Kevin Monroe, President of the Student Body; James J. Exum, Speaker of the Council; Sherrod Banks, President of BSM; and Kevin B. Jones, Vice Chairman of the Undergraduate Court.

B. *Minority Provision Governing the Council.*

8. The student government of UNC at Chapel Hill is a student-run organization which, exercising authority delegated it by the Chancellor, manages various aspects of student affairs at that institution. The structure of the student government is established by the Student Constitution of UNC at Chapel Hill (Student Constitution), a document adopted and subject to amendment by the student body. It provides for three branches of student government: the legislature, consisting of the Council; the executive, headed by the President of the Student Body (Student Body President); and the judiciary, which includes the Supreme Court of the Student Body and the Undergraduate Court established pursuant to the Instrument.

9. The Student Constitution provides that the Council consist of twenty elected Councillors and the Student Body President as an ex officio member. Guaranteed minority race representation is achieved through the requirement, set forth in Article I, Section 1.D.[7] (hereinafter referred to

---

of this section are not fulfilled, the President of the Student Body, with the consent of the Council, shall make the number of appointments necessary to ensure compliance with this section, PROVIDED, that any such appointment shall take effect unless rejected by the Council within 10 days of submission. All appointed Councillors shall have the same rights, privileges, and duties of elected Councillors and shall serve for the remainder of the term of the Council. No appointments made necessary by the results of a Spring Election shall be submitted to other than the Council newly elected.

Student Const. art. I, § 1.D.

as the minority provision regarding the Council), that such additional persons be appointed to the Council by the Student Body President, with the consent of the Council, as necessary to ensure that there are serving on the Council at all times at least two persons of a minority race, as well as two women and two men. Undergraduate, graduate, and professional students at UNC at Chapel Hill are eligible for appointment. There is no application process for those seeking appointment. The Student Body President has exercised his appointment power in four separate years, 1976–77, 1978–79, 1979–80, and 1980–81. One person was appointed in each year, all of them black. On none of these occasions were any of the Plaintiffs considered for appointment pursuant to the minority provision because each is of the white race.

10. The Council and the minority representation provision governing it have their origins in the January 18, 1972, report of the Presidential Commission on the Goals and Organization of Student Government (Presidential Commission), a group of students appointed by the Student Body President to study student government at UNC at Chapel Hill. The Presidential Commission's report proposed replacement of the existing Student Legislature of up to fifty-five members with a Campus Governing Council, essentially identical to today's Council, including the requirement for minority representation, except that it would have only fifteen members. Adoption of the proposal required amendment of the Student Constitution by a referendum of the student body, which would be mandated upon approval of the proposal by the Student Legislature or could be called by the Student Body President upon petition of a certain number of students. A constitutional amendment incorporating the proposal was submitted to the Student Legislature but that body failed to act on it promptly. In response, a referendum was brought by petition on February 29, 1972. In the referendum, the proposed amendment received a majority of the vote but not the two-thirds required.

11. In 1972 a black was elected as Student Body President for the first time at UNC at Chapel Hill. At the start of the academic year in the fall of 1972, he modified the proposed amendment to increase Council membership to the current twenty. About the same time an alternate proposal, not providing for guaranteed minority representation, was submitted to the Student Legislature, where it was defeated. Again, a referendum by petition was organized. Held on October 17, 1972, it approved the revised amendment providing for guaranteed minority representation by the requisite two-thirds majority but its results were later nullified on technical grounds. The revised amendment was brought to a referendum by petition for a third time on November 14, 1972, in which the student body duly adopted it.

12. During consideration of the proposal and constitutional amendment for the Council and the minority provision governing it, the Student Body President, Councillors, the daily student paper at UNC at Chapel Hill, and other student organizations and individuals stated their positions on the minority provision and the rationales behind them. However, at no time prior to adoption of the minority provision did the Presidential Commission, the Student Legislature, any student referendum, or any other person or body having authority over any step in adoption of the minority provision prepare, adopt, or consider findings regarding the need for it as a means to remedy prior identified discrimination in the student legislature or otherwise at UNC at Chapel Hill. No such findings have thereafter been so prepared, adopted, or considered.

13. Although the Council minority provision encompasses appointments made on the basis of sexual and minority racial identities, its overriding purpose is to ensure the representation of blacks on the Council, who comprise by far the largest racial minority among students at UNC at Chapel Hill. The minority provision has been uniformly interpreted and utilized as having the representation of blacks as its overriding purpose, as clearly appears from the exhibits, testimony, statements, and briefs of the Defendants.

### C. Minority Provision Governing the Undergraduate Court.

14. The Undergraduate Court at UNC at Chapel Hill, exercising authority delegated it by the Chancellor, is a tribunal of student judges established by the Instrument for the purpose of adjudicating cases of alleged student violation of the rules governing both academic and non-academic student behavior at that institution. Pursuant to the Instrument, the bench for the Undergraduate Court consists of thirty (30) students appointed for one year terms by the Student Body President with the consent of the Council. In addition, there are a Chairman and two Vice Chairmen who are elected annually by the outgoing bench from among its members. Individual panels consist of five (5) judges, including either the Chairman or a Vice Chairman who presides.

15. Guaranteed minority race representation on these panels is effected through the interaction of two requirements of § IV.C.2 of the Instrument[8] (hereinafter referred to collectively as the minority provision regarding the Undergraduate Court). One[9] requires that the bench include at least eight (8) whites and eight (8) minority race members, as well as twelve (12) women and twelve (12) men. The other requirement[10] is that three of the five panel members, who are selected using a random drawing process from various pools of court members, be of either the defendant's race or sex if the defendant so chooses. The bench appointments requirement obviously serves to ensure that there are sufficient minority race and female judges on the court to permit the requisite individual panel appointments.

16. All undergraduates with at least one academic semester who are not otherwise barred from service on the Undergraduate Court are eligible for appointment to it. Instrument § IV.C.2(a). Those seeking appointment may file applications with a committee which prepares a list of candidates from which the appointments are to be made. Id. § IV.C.2.c(2), (3). In recent years the application process has been well publicized throughout the campus.

17. The Undergraduate Court, as it is presently constituted with guaranteed minority representation, traces its origin to widespread student protest against various aspects of the student judicial system in the turbulent late 1960's. As part of the unrest, on February 23, 1969, BSM formally announced its rejection of the student court system and the establishment of a separate court for black defendants. It objected to, among other things, the absence of black judges on the regular student courts and the election process for judges. On April 1, 1969, a black student was elected to the student court for the first time under existing procedures. Three weeks later, on April 22, 1969, a student referendum approved a constitutional amendment authorizing the appointment by the Student Body President of black students to sit as additional judges on particular panels where he deemed it

---

**8.** Instrument § IV.C.2(a), (e)(2).

**9.** Instrument § IV.C.2(a), which reads as follows:

In addition to the Chairman and the Vice Chairmen, the Court shall have at least thirty members, and may have as many additional members as the Committee on Student Conduct [a committee of students, faculty, and administrators established by the Instrument] determines in its discretion are needed to carry out the Court's business. At least twelve members shall be of the male sex and at least twelve shall be of the female sex. At least eight members shall not be of the majority race, and at least eight members shall not be of the minority race.

**10.** Instrument § IV.C.2(e)(2), which reads as follows:

If requested by the defendant, provision shall be made for racial or sexual representation (but not both) on the trial court, as follows: a) At least three of the five members of the trial court shall be of the same sex as the defendant; b) When a defendant is not a member of the majority race, at least three of the five members of the trial court shall not be of the majority race; c) When a defendant is a member of the majority race, at least three of the five members of the trial court shall be of the majority race.

necessary. The Student Legislature eventually adopted legislation implementing this amendment, thereby establishing the so-called minority courts. BSM agreed to abandon its separate black court in favor of the minority courts.

18. On April 25, 1969, the Chancellor and Student Body President appointed a committee, the Judicial Reform Committee, composed of five students, three faculty members, and two administrators to develop more comprehensive reform proposals for the student judicial system. (The Committee was not limited to students because, unlike other aspects of student government, the functions of the student courts were considered a matter of legitimate concern to the university community generally.) Over the ensuing four and one-half years, the Committee prepared and submitted for approval to the Student Body President, chairman of the faculty, and Chancellor seven drafts of a reform proposal, which came to be known as the Instrument of Student Judicial Governance. In its initial drafts the Committee rejected any type of guaranteed minority representation. By January 1973, however, the Committee had incorporated into its proposals guaranteed minority representation on the bench as a whole, but not representation on individual panels as then existed on the minority courts. Black opposition to termination of guaranteed representation on individual panels was intense, particularly after the Student Attorney General succeeded temporarily in discontinuing it on legal grounds in spring 1973.

19. In order to expedite judicial reform, Chancellor Taylor on November 5, 1973, authorized a special review committee of students, faculty, and administrators to make a recommendation to him on approval of the latest draft of the Judicial Reform Committee. Ten days later the Chancellor's committee produced another draft Instrument which provided for both minority representation on the bench and on individual panels. Specifically, it provided for an Undergraduate Court with a bench of forty-two judges consisting of fourteen men and fourteen women elected from fourteen electoral districts, and fourteen persons appointed by the Student Body President with the consent of the Council. Twelve members of the bench had to be minority race members. Each individual panel comprised seven judges, four of whom would be of the defendant's race or sex if he so requested. Panels were drawn randomly in a process comparable to that in use today. No provision was made for application by students for appointment to the court. This proposed Instrument was approved by the Chancellor on December 3, 1973; by the Council in the form of a constitutional amendment implementing the Instrument; by the student body acting in a referendum on the constitutional amendment held on February 27, 1974; and by the Faculty Council, a body representing the faculty, on March 29, 1974. The Instrument went into effect on October 2, 1974.

20. The Instrument was amended effective March 26, 1976, by approval of the Chancellor, Council, student body acting in a referendum, and Faculty Council, upon recommendation of a committee established for such purpose by the Instrument, to provide for appointment of all judges by the Student Body President, the application process for appointment currently in effect, reduction in the size of the bench and individual panels to their current levels, and a corresponding reduction in the figures for mandatory racial and sexual representation. Additional amendments not germane to this litigation have subsequently been made. There have been numerous appointments of blacks to the bench and individual panels of the Undergraduate Court pursuant to the minority provision of the Instrument since its adoption. All persons appointed to the bench subsequent to the March 1976 amendments have filed applications; those appointed prior to these amendments did not, there being no application procedure. None of the Plaintiffs has ever applied for appointment to any of the eight positions on the bench reserved for members of a minority race and none has ever been considered for such a position because each is white.

21. During consideration of the various drafts of the Instrument and of the subse-

quent amendments to it, the Student Body President, the Faculty Council, the Chancellor, the daily student paper at UNC at Chapel Hill, and other individuals and groups among the students, faculty, and administration stated their positions on the minority provision governing the Undergraduate Court and the rationale behind them. However, at no time prior to adoption of the minority provision did the Chancellor, the Student Legislature, the Faculty Council, or any other individual or group among the students, faculty, or administration with authority over any step in adoption of the minority provision prepare, adopt, or consider findings regarding the need for it as a means to remedy prior identified discrimination in the student honor courts or otherwise at UNC at Chapel Hill. No such findings have thereafter been so prepared, adopted, or considered. There is a comparable absence of findings with respect to the measures establishing the minority courts.

22. Although the Undergraduate Court minority provision encompasses appointments to both the bench and individual panels made on the basis of sexual and minority racial identities, its overriding purpose is to ensure representation of blacks on the Undergraduate Court, who comprise by far the largest racial minority among undergraduate students at UNC at Chapel Hill. The minority provision has been uniformly interpreted and utilized as having the representation of blacks as its overriding purpose, as clearly appears from the exhibits, testimony, statements, and briefs of the Defendants. The measures establishing the minority courts had a comparable overriding purpose and were interpreted and utilized in a comparable manner.

### D. History of Civil Rights Enforcement Activities Involving UNC.

23. Prior to 1955, North Carolina by law maintained a segregated system of state-supported higher education. In that year, this court, building on then recent precedent, *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (segregation of primary and secondary schools held unconstitutional); *McKissick*

*v. Carmichael*, 187 F.2d 949 (4th Cir.1951) (segregation of law school held unconstitutional), ordered the admission of blacks to undergraduate schools in the North Carolina system. *Frasier v. Board of Trustees of the University of North Carolina*, 134 F.Supp. 589 (M.D.N.C.1955), *aff'd mem.*, 350 U.S. 979, 76 S.Ct.467, 100 L.Ed. 848 (1956). Thereafter, in 1957 and 1963, the North Carolina General Assembly repealed statutes mandating segregation in higher education in the state.

24. In February 1970, the Department of Health, Education, and Welfare (HEW) (predecessor to the current Department of Education [DOE]), determining pursuant to pre-hearing procedures that vestiges of segregation persisted in the state's post-secondary schools, ordered North Carolina to submit to it a statewide remedial plan to ensure its compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* After eight months, on October 17, 1971, several private parties dissatisfied with HEW's efforts sued HEW in United States District Court to compel it to commence a formal proceeding against North Carolina (as well as several other states). *Adams v. Richardson*, 351 F.Supp. 636 (D.D.C.1972) (findings of fact and conclusions of law as amended), 356 F.Supp. 92 (D.D.C.) (order granting judgment and injunction), *aff'd*, 480 F.2d 1159 (D.C.Cir. 1973) (*en banc*). The court in *Adams* responded on February 16, 1973, by issuing an injunction which, as modified by the court of appeals, ordered HEW to seek a negotiated settlement with North Carolina, but failing that to commence a formal administrative proceeding against it. *Id.* Thereafter, HEW and North Carolina engaged in negotiations culminating in HEW's acceptance of The Revised North Carolina State Plan for the Further Elimination of Racial Duality in the Public Post-Secondary Education Systems (Revised State Plan), on July 19, 1974. One year later, HEW made a determination under pre-hearing procedures that North Carolina was in default of its commitments under the Revised State Plan.

25. On April 1, 1977, the court in *Adams* found the Revised State Plan unlawful and ordered HEW to require North Carolina to submit another remedial plan. *Adams v. Califano*, 430 F.Supp. 118 (D.D.C. 1977). The new proposal, the Revised State Plan, Phase II: 1978–1983 (Phase II), was provisionally accepted by HEW on May 12, 1978, but HEW eventually made a determination that North Carolina was not in compliance with it. As a result, on March 29, 1979, HEW commenced a formal administrative proceeding against the state. North Carolina in turn filed suit against HEW in United States District Court on April 24, 1979, seeking to enjoin the administrative proceeding, among other things. *North Carolina v. Department of Education*, 480 F.Supp. 929 (E.D.N.C. 1979). On July 17, 1981, that court approved a consent decree entered into by North Carolina and DOE resolving all issues between the parties and requiring dismissal of the administrative proceeding.

26. Various documents submitted to and issued by HEW, DOE, and the courts in the course of the enforcement activities involving North Carolina outlined above, make reference to prior racial discrimination within UNC. However, none of these documents presents findings regarding the need for either minority provision as a means to remedy prior identified discrimination in the student government or otherwise at UNC at Chapel Hill.

### III.

### CONCLUSIONS OF LAW

The court makes the following conclusions of law:

#### A. *Jurisdiction.*

1. This court has jurisdiction over Plaintiffs' claims, brought under 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331, 1343.

#### B. *Equal Protection Claims.*

2. Plaintiffs challenge the minority provisions governing the Council and Undergraduate Courts on the following grounds not previously adjudicated: that the minority provision governing the Council deprives the Plaintiffs of their rights to equal protection of the law under the fourteenth amendment by preventing them from being considered, solely because of their race, for appointment to either of the two appointive seats on the Council reserved for minority race members in the event that less than two are elected to the Council; and that the minority provision governing the Undergraduate Court deprives the Plaintiffs of their rights to equal protection of the law under the fourteenth amendment by preventing them from being considered, solely because of their race, for appointment to any of the eight seats on the Undergraduate Court bench reserved for minority race members and by requiring that the selection of judges for particular panels be made on the basis of race if a defendant so chooses. In accordance with a motion by Plaintiffs themselves, their additional claims that each minority provision also violates 42 U.S.C. § 2000d, which prohibits racial discrimination in programs receiving federal funds, will be dismissed with prejudice.[11] There is insufficient evidence, if any, in the record to support this claim. The court will deny original Defendants' motion to dismiss President Friday on the basis of its finding *supra* that he has indirect authority over the minority provisions.

#### 1. Mootness and Standing.

3. The court finds at the outset that two initial procedural challenges to Plaintiffs' claims are without merit—that the case has been mooted by the graduation of Plaintiffs and that Plaintiffs fail to meet the constitutional and prudential requirements for standing. Mootness is pre-

---

**11.** The court is dismissing on these grounds the fourth, sixth, tenth, and twelfth causes of action in the original complaint, and the second, fourth, sixth, and eighth causes of action in the two complaints in intervention. The other causes of action in the original complaint that allege violations of 42 U.S.C. § 2000d—the second and eighth—were disposed of by this court in its initial decision granting Defendants summary judgment on each. Plaintiffs' motion addresses only the aforesaid causes of action in the complaints in intervention.

cluded by the court's finding, made *supra* and in its order of March 17, 1983, denying cross-motions for summary judgment, that at least one of the Plaintiffs has been enrolled as a student at UNC at Chapel Hill throughout this litigation.

■ 4. Standing exists because the minority provisions [12] inflict direct injury on Plaintiffs [13] by denying them on account of their race the opportunity to compete evenly with other members of the student body of UNC at Chapel Hill for the appointive seats on the Council and the bench of the

Undergraduate Court reserved for minority race members when they are otherwise eligible to be considered for such appointment.[14] *See Bakke,* 438 U.S. at 280 n. 14, 98 S.Ct. at 2743 n. 14.[15] The fact of such injury, *see Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978),[16] and its traceability to the minority provisions, *see Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977),[17] the two principal constitutional

**12.** Although in the case of the Undergraduate Court minority provision it is the bench appointments requirement which inflicts such injury on Plaintiffs, their standing encompasses the individual panel appointments requirement as well. As indicated *supra,* the two requirements are not distinct regulations, but instead operate as a single statutory scheme to achieve minority representation on individual panels.

**13.** In accordance with the court's finding *supra* regarding eligibility for appointment to the Council, the finding of standing with respect to the Council minority provision applies to each Plaintiff for the period of his tenure in good standing as an undergraduate, graduate, or professional student at UNC at Chapel Hill. At least one Plaintiff having standing to challenge the Council minority provision has been present in this litigation continuously since its commencement.

Similarly, the finding of standing with respect to the Undergraduate Court provision applies for the period of a Plaintiff's tenure in good standing as an undergraduate only. At least one Plaintiff having standing with respect to the Undergraduate Court claim has been present in this case continuously since the claim was introduced into this case by the complaint in intervention of Richard Jeffrey Kania as an undergraduate in June 1978. The complaint of the initial Plaintiffs did not challenge the Undergraduate Court provision per se, but rather a provision in the Student Constitution establishing a predecessor to the Undergraduate Court, the so-called minority courts. The record suggests that the initial Plaintiffs may not have had standing with respect to the minority courts provision because they were graduate and professional students. Any such initial absence of standing to assert a claim against guaranteed minority representation on the student honor courts was remedied by the complaint in intervention of Richard Jeffrey Kania. Through it, such a claim was brought into this litigation anew by a Plaintiff who did have standing to make it. Of course, those Plaintiffs who have graduated no longer have standing with respect to either minority provision.

**14.** The court previously held in its March 17, 1983, order that Plaintiffs have standing with respect to the Council minority provision.

**15.** *See also Turner v. Fouche,* 396 U.S. 346, 362–63, 90 S.Ct. 532, 541, 24 L.Ed.2d 532 (1970) (failure of county on account of race to consider citizens for appointment to board of education held actionable by them as violations of their rights to equal protection under the fourteenth amendment); *Carter v. Jury Commission,* 396 U.S. 320, 329–30, 90 S.Ct. 518, 523, 24 L.Ed.2d 549 (1970) (same holding with respect to service on grand and petit juries).

**16.** *See also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) [hereinafter cited as *Valley Forge Christian College* ]; *Scott v. Greenville County,* 716 F.2d 1409, 1414 (4th Cir.1983).

**17.** *See also Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758; *Scott v. Greenville County,* 716 F.2d at 1414.

Because the injury to Plaintiffs is traceable to the alleged unconstitutional state action, the instant case is distinguishable from *Poovey v. Edmisten,* 526 F.Supp. 759 (E.D.N.C.1981). In that case, a student and several others were held not to have standing to challenge on equal protection and other grounds a statute, N.C.Gen.Stat. § 116–6(d), (e), which requires that the North Carolina General Assembly elect at least four members of a minority race to the thirty-two member Board of Governors of UNC. The Plaintiffs in *Poovey* failed to establish that their non-appointment to the Board of Governors resulted from the minority representation requirement rather than from some other cause. Their claim that this requirement had violated their rights was therefore "conjectural and hypothetical." *Id.* at 764. In contrast, the allegedly unconstitutional provisions here have been established as the cause of the denial to Plaintiffs of the opportunity to compete evenly for appointment.

requirements for standing, are established by among other evidence the parties' stipulation that "the several Presidents of the Student Body have not considered any plaintiff herein for appointment to [the Council or Undergraduate Court] ... because the plaintiffs were not members of a minority race."[18] This injury is clearly redressible by the court's enjoining enforcement of the minority provisions. *See id.* at 262, 97 S.Ct. at 561.[19] The prudential requisites to standing are met because Plaintiffs are asserting their own rights, not those of others, *see Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 80, 98 S.Ct. at 2634;[20] their grievance relates to opportunities denied them personally as students at UNC at Chapel Hill and is not an abstract, "generalized grievance," *id.;*[21] and the harm they allege falls within the "zone of interests" protected by the fourteenth amendment, *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).[22]

5. The fact that Plaintiffs did not apply for appointment to the Undergraduate Court does not otherwise deprive them of standing to challenge the minority provision governing it.[23] Although since adoption of the application procedure in 1976

the Student Body President has chosen to appoint only students who have applied, the Instrument does not make application a condition to being considered for appointment.[24] Rather, by its express terms, application is optional: "[a]ny interested undergraduate student *may* apply to the [appointments] committee to be considered for" appointment by the Student Body President. Instrument § IV.C.2.c(3) (emphasis added).

6. Moreover, there is authority suggesting that even if an application requirement existed the futility of applying may have obviated the need to do so, at least where, as here, the harm alleged can otherwise be traced to the purported constitutional violation. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 365–66, 97 S.Ct. 1843, 1869–70, 52 L.Ed.2d 396 (1977) (challenge to allegedly discriminatory hiring practices under Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ).[25] As the Supreme Court said in *Teamsters,* a person eligible for a position who does not "engage in a futile gesture [of applying for it] ... is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Id.* In any case, the denial to Plaintiffs here of the opportunity to be considered for appointment did not result from their non-

---

**18.** Plaintiffs' Exhibit No. 1A at 2 ¶ 1(b), (c) (quoting Order on Final Pre-Trial Conference at 4–5 ¶ 6(b), (c) [July 22, 1983] ).

**19.** *See also Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758; *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. at 74, 75 n. 20, 98 S.Ct. at 2630, 2631 n. 20.

**20.** *See also Valley Forge Christian College,* 454 U.S. at 474, 102 S.Ct. at 759.

**21.** *See also Valley Forge Christian College,* 454 U.S. at 474–75, 102 S.Ct. at 760; *United States v. Richardson,* 418 U.S. 166, 175–80, 94 S.Ct. 2940, 2945–48, 41 L.Ed.2d 678 (1974).

**22.** *See also Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760.

**23.** *See Turner v. Fouche,* 396 U.S. at 362–63, 90 S.Ct. at 541 (citizens have standing to challenge alleged discrimination in appointments to board of education by virtue of their citizenship); *Carter v. Jury Commission,* 396 U.S. at 329–30, 90

S.Ct. at 523 (same holding with respect to service on grand and petit juries).

**24.** In cases in which application is a condition to being considered for selection, *e.g., Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166–67, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972) (fourteenth amendment challenge to admission practices of private club), standing of plaintiffs has been held to require that they file an application or take other action directed toward establishing their eligibility to be considered, at least where the alleged denial of consideration is not otherwise traceable to the purported constitutional violation. *Compare id. with Turner v. Fouche,* 396 U.S. at 362–63, 90 S.Ct. at 541, *and Carter v. Jury Commission,* 396 U.S. at 329–30, 90 S.Ct. at 523.

**25.** *Hairston v. McLean Trucking Co.,* 520 F.2d 226, 231–32, 232 n. 2 (4th Cir.1975) (same); *Byrd v. Local Union No. 24, IBEW,* 375 F.Supp. 545, 568 (D.Md.1974) (challenge to allegedly discriminatory admission practices of union as violative of *inter alia* fourteenth amendment).

application, but instead from their race, as the parties have stipulated.

### 2. Purposeful Discrimination by the State.

■■■ 7. The court also finds that Plaintiffs, as the party alleging violations of the equal protection clause, have met their burden of demonstrating that the state, here North Carolina, has engaged in purposeful racial discrimination, a finding clearly anticipated by the Fourth Circuit in its remand. *See Uzzell v. Friday,* 625 F.2d at 1121, *cert. denied,* 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808. The requisite state action, whose existence is not seriously contested by any Defendant, is the adoption and continuing utilization of the minority provisions under authority of the Chancellor derived ultimately from the statutes of North Carolina. *See Arrington v. Taylor,* 380 F.Supp. 1348, 1352–53, 1365 (M.D. N.C.1974) (Gordon, J.), *aff'd mem.,* 526 F.2d 587 (4th Cir.1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976); Code of UNC § 502D(3); *accord Kania v. Fordham,* 702 F.2d 475 (4th Cir. 1983) (student newspaper at UNC at Chapel Hill found implicitly to be state activity). Purposeful discrimination exists because by their express terms the minority provisions establish racial classifications. *See Bakke,* 438 U.S. at 289 n. 27, 318, 98 S.Ct. at 2747 n. 27, 2762. Contrary to contentions by Defendants, no further demonstration of discriminatory intent is needed. *See id.* at 289 n. 27, 98 S.Ct. at 2747 n. 27.

### 3. *Bakke's* Requirements.

8. The issue now becomes the central one in this case: whether Defendants can provide adequate justification under the tests set forth in *Bakke* and its progeny for the racial discrimination effected by the minority provisions. In *Bakke* a white male applicant to a medical school challenged the school's special admission plan which reserved sixteen of 100 places in the entering class for minority or disadvantaged applicants. In his opinion announcing the judgment of the Court, Justice Powell held that the special admissions program was invalid—a ruling supported by four other Justices whose views were expressed in an opinion by Justice Stevens [26]—but that, at the same time, the school could take race into account in its admissions decisions—a ruling supported by four other Justices whose views were expressed in a joint opinion and three separate opinions.[27] As the Fourth Circuit has indicated, *see Uzzell v. Friday,* 625 F.2d at 1121 (adopting 591 F.2d at 1000–01 [Winter, C.J., dissenting]), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808, of the several opinions filed in *Bakke,* the opinion of Justice Powell is the one which governs this case.

■■ 9. In his opinion, Justice Powell held that racial classifications like those here are suspect classifications subject to strict scrutiny.[28] *Uzzell v. Friday,* 591 F.2d at 1000 (Winter, C.J., dissenting) (citing *Bakke,* 438 U.S. at 305, 98 S.Ct. at 2756), *adopted,* 625 F.2d at 1121, *cert. denied,* 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808; *see also Fullilove v. Klutznick,* 448 U.S. 448, 496 & n. 1, 507, 100 S.Ct. 2758, 2783 & n. 1, 65 L.Ed.2d 902

---

**26.** Chief Justice Burger and Justices Stewart and Rehnquist joined in Justice Stevens' opinion. Unlike Justice Powell who rested his opinion on the fourteenth amendment, Justice Stevens did not reach the constitutional issue, basing his opinion instead on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*

**27.** Justices Brennan, White, Marshall, and Blackmun filed the joint opinion. Justices White, Marshall, and Blackmun each wrote separately.

**28.** *Bakke* makes clear that the first amendment freedom a state university enjoys as an educational institution does not ease the requirements of the strict scrutiny test otherwise applicable to it as a governmental agency. *See Bakke,* 438 U.S. at 311–15, 98 S.Ct. at 2759–61. Rather, the first amendment protection accorded its educational mission simply transforms certain interests relating to that mission into substantial interests. *See id.*

(1980) (Powell, J., concurring) [hereinafter cited as *Fullilove* ].[29] In order to sustain the validity of such racial classifications, the state has the burden of showing, first, that the bodies which adopted the racial classifications or the bodies which authorized their adoption made findings prior to such adoption that the racial classifications were necessary to remedy identified discrimination. *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757; *Fullilove*, 448 U.S. at 497, 100 S.Ct. at 2784 (Powell, J., concurring); *Uzzell v. Friday*, 591 F.2d at 1001 (Winter, C.J., dissenting), *adopted*, 625 F.2d at 1121, *cert. denied*, 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808. As Justice Powell stated,

the Court 'has never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations.' But, '[a]fter such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial since the legal rights of the victims must be vindicated.'

*Uzzell v. Friday*, 591 F.2d at 1001 (Winter, C.J., dissenting) (quoting *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757) (citations omitted), *adopted*, 625 F.2d at 1121, *cert. denied*, 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808.

10. Second, the body adopting or authorizing the racial classification must be shown to have the competence to make the requisite findings.

[I]solated segments of our vast governmental structures are not competent to make those decisions, at least in the absence of legislative mandates and legislatively determined criteria. *Cf. Hampton v. Mow Sun Wong*, 426 U.S. 88 [96 S.Ct.

1895, 48 L.Ed.2d 495] (1976); n. 41, *supra*. Before relying upon these sorts of findings in establishing a racial classification, a governmental body must have the authority and capability to establish, in the record, that the classification is responsive to identified discrimination. See, *e.g.*, *Califano v. Webster*, 430 U.S. [313] at 316–321 [97 S.Ct. 1192 at 1194–1196, 51 L.Ed.2d 360]; *Califano v. Goldfarb*, 430 U.S. [199] at 212–217 [97 S.Ct. 1021 at 1029–1032, 51 L.Ed.2d 270].

*Bakke*, 438 U.S. at 309–10, 98 S.Ct. at 2758; *see also Fullilove*, 448 U.S. at 483–84, 100 S.Ct. at 2777 (opinion of Burger, C.J.), 498 (Powell, J., concurring).

11. Third, the state must show that the purposes served by the racial classifications, besides remedying past discrimination, are " 'both constitutionally permissible and substantial.' " *Uzzell v. Friday*, 591 F.2d at 1000 (Winter, C.J., dissenting) (quoting *Bakke*, 438 U.S. at 305, 98 S.Ct. at 2756), *adopted*, 625 F.2d at 1121, *cert. denied*, 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808; *see also Fullilove*, 448 U.S. at 473, 100 S.Ct. at 2772 (opinion of Burger, C.J.), 496 (Powell, J., concurring). Fourth and last, the state must show "that its use of the classification is 'necessary ... to the accomplishment' of its purpose or the safeguarding of its interest," *Uzzell v. Friday*, 591 F.2d at 1000 (Winter, C.J., dissenting) (quoting *Bakke*, 438 U.S. at 305, 98 S.Ct. at 2756), *adopted*, 625 F.2d at 1121, *cert. denied*, 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808, but that at the same time it " 'work[s] the least harm possible to other innocent persons competing for the benefit,' " *id.* at 1001 (quoting *Bakke*, 438 U.S. at 308, 98 S.Ct. at 2757); *see also Fullilove*, 448 U.S. at 480, 100 S.Ct. at 2775 (opinion of Burger, C.J.), 498 (Powell, J., concurring); *Uzzell v. Friday*, 625 F.2d at

**29.** In *Fullilove*, decided after *Bakke*, the Court upheld the minority business enterprise provision of the Public Works Employment Act of 1977, recognizing Congress' unique attributes as a legislative body. The statute at issue in the case requires that ten per cent of federal funds for local public works projects be used to purchase services and supplies from businesses owned by specified racial and ethnic minorities. Chief Justice Burger wrote an opinion announcing the judgment of the Court in which Justices White and Powell joined. Justice Powell also filed a concurring opinion applying the test set forth in his opinion in *Bakke*. Justice Marshall, joined by Justices Brennan and Blackmun, filed an opinion concurring in the judgment. Justice Stewart filed a dissenting opinion in which Justice Rehnquist joined. Justice Stevens also filed a dissenting opinion.

1120, *cert. denied,* 446 U.S. 951, 100 S.Ct. 2917, 64 L.Ed.2d 808.

4. Findings.

■ 12. Applying these principles to the facts of this case, it is apparent that there is a complete failure to show that the requisite findings were made with respect to either of the minority provisions. There is simply no evidence in the record which establishes or purports to establish that minority race students have ever been excluded from the Council, Undergraduate Court, or any other organ of student government on account of their race; that the legislation enacted by the Council, decisions rendered by the Undergraduate Court, or action taken by any other organ of student government in the performance of its duties has discriminated against minority race students on account of their race; or that the minority provisions were or are needed or were in fact intended to remedy any such discrimination.

13. The evidence, for instance, establishes that no findings were approved or even considered by the bodies which adopted the minority provisions.[30] Nor did the other bodies which considered the minority provisions prior to their adoption[31] make findings. The only contemporaneous documentation of the need for the minority provisions as remedial measures or other-

wise consists primarily of oral statements by individuals of their personal viewpoints along with other materials not constituting findings.[32] Although they would in any case be inadequate under *Bakke* for reasons stated *infra,* no findings have subsequently been made by any body with authority over any step in adoption or amendment of the minority provisions.[33]

14. The requisite findings are also not to be found in any of the documents in evidence arising from HEW's enforcement activities against North Carolina and the related litigation. The only pertinent references to student organizations in these materials relate to a provision in the Revised State Plan requiring the acquisition of pledges of non-discrimination from student groups.[34] None of the documents discusses prior discrimination in student government at UNC at Chapel Hill or the need for the minority provisions to remedy prior discrimination.

15. In addition, for one reason or another, none can properly be relied upon as findings. As the Fourth Circuit has recognized, the letter determinations and administrative complaints from HEW alleging racial discrimination by UNC are merely preludes to the making of findings at an adversary proceeding. *Adams v. Richardson,* 480 F.2d 1159, 1163–64, 1163 n. 5 (4th Cir. 1973) (*en banc*); *see also* 42 U.S.C.

---

30. In the case of the Council minority provision, the adopting body was the student referendum of November 14, 1972. In the case of the Undergraduate Court minority provision the adopting bodies were the Chancellor, the Faculty Council, the Council, and the student referendum of February 27, 1974.

31. In the case of the Council minority provision, these bodies were the student body referenda of February 29 and October 17, 1972, the Council, and the Presidential Commission. In the case of the Undergraduate Court minority provision, they were the Judicial Reform Committee and the Chancellor's special review committee.

32. In the case of the Council minority provision, these materials include a report by a committee appointed by the Chancellor on a February 1972 survey of minority students at UNC at Chapel Hill (intervening Defendants' Exhibit No. 20). The report makes no reference to the Council and there is no evidence that it was ever approved by any body with authority to adopt the minority provision. In the case of the Undergraduate Court minority provision, these documents include a letter issued by a faculty com-

mittee which states its support without analysis of the concept of minority representation on individual court panels (original Defendants' Exhibit No. 7, app. B) and a less than one sentence reference favorable to the minority provision for the Undergraduate Court in the introduction to a faculty report on other aspects of racial relations at UNC at Chapel Hill (intervening Defendants' Exhibit No. 19).

33. There is a similar absence of findings to support adoption in 1969 of the constitutional amendment and implementing legislation establishing the predecessor tribunals to the current Undergraduate Court, the so-called minority courts.

34. *See* intervening Defendants' Exhibit No. 3 at 10–11 (Letter from Peter E. Holmes, Director of Office for Civil Rights, to Governor James E. Holshouser, Jr. [November 10, 1973]); intervening Defendants' Exhibit No. 6 at 17–18 (Office for Civil Rights' Evaluation of Implementation of Revised State Plan at 17–18 [July 31, 1975]). A portion of the Revised State Plan (Section III.B.8) entitled "Student Organizations" was not offered into evidence.

§ 2000d–1; 34 C.F.R. § 100.7(d)(1), 100.8–100.10. For the same reason the court's decisions in the *Adams* case upholding HEW's determinations do not constitute findings. *See Adams v. Richardson*, 480 F.2d at 1163–64, 1163 n. 5. The various remedial proposals submitted by North Carolina to HEW, even those accepted by it, were by nature not concerned with delineating prior discrimination, but rather with detailing prospective remedies.[35] Also failing is the consent decree adopted in *North Carolina v. Department of Education*, 480 F.Supp. 929 (E.D.N.C.1981) (consent decree entered); Section V thereof states expressly that the court issuing it made no related findings of a violation of law and that the decree may not be used to establish a violation in any other proceeding.

16. The trial testimony of Chancellors Taylor and Fordham, while supportive of the minority provisions as remedial measures, denies that UNC at Chapel Hill engaged in racial discrimination at the time of their adoption or subsequently. Both witnesses testified that they had no knowledge of any discrimination in the selection of students for the Council, Undergraduate Court, or any other organ of student government at UNC at Chapel Hill. The testimony also lacks the character of findings, comprising mere conclusory statements. Furthermore, the supporting evidence required by *Bakke* is contemporaneous written documentation of the " 'actual purposes' "[36] of the racial classification.

*Bakke*, 438 U.S. at 307–08, 309, 98 S.Ct. at 2757, 2758. Such *"post hoc* declarations ... to establish ... a remedial purpose" as those of the Chancellors are inadequate.[37] *Id.* at 294 n. 34, 98 S.Ct. at 2750 n. 34.[38]

5. Competency of Adopting Bodies.

17. Even if findings had been made, they would be inadequate because the bodies adopting the minority provisions clearly lacked the requisite competency to make such findings under the second prong of the *Bakke* test. Such competency requires that the adopting governmental body be organized and function for the purpose of "the formulation of ... legislative policy or the adjudication of particular claims of illegality" or be authorized by such a body. *Bakke*, 438 U.S. at 309, 98 S.Ct. at 2758. *Bakke* held that because its broad mission is education the governing body of the University of California fails to meet this standard. *Id.* The adopting bodies here, all subordinate in authority to the governing body of UNC, the Board of Governors, presumably have even less competency to make findings.

18. In addition, as in the case of the governing board of the California system, the function of all the adopting bodies here is educational. The Chancellor functions to carry out the policies, educational in purpose under *Bakke*, of the Board of Governors of UNC, and the Faculty Council to represent the interests of faculty members at UNC at Chapel Hill as educators. The purpose of the student governmental bod-

**35.** Moreover, neither of the proposals accepted, the Revised State Plan and Phase II, was approved until after the minority provisions for both the Council and Undergraduate Court had been adopted. As explained *infra*, such *post hoc* justifications do not satisfy *Bakke*'s requirements.

**36.** *Califano v. Webster*, 430 U.S. 313, 317, 97 S.Ct. 1192, 1194, 51 L.Ed.2d 360 (1977) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 [1975] ), *cited in Bakke*, 438 U.S. at 309, 98 S.Ct. at 2758.

**37.** Other similar evidence in the record includes an unwritten determination by Chancellor Fordham and his staff at an undetermined time after his assumption of office that the Undergraduate Court minority provision should be continued.

**38.** The decision of this court requiring the admission of blacks to undergraduate schools within the North Carolina state-supported system, *Frasier v. Board of Trustees of the University of North Carolina*, 134 F.Supp. 589 (M.D.N.C. 1955), *aff'd mem.*, 350 U.S. 979, 76 S.Ct. 467, 100 L.Ed. 848 (1956), also fails to provide the requisite findings. Issued over sixteen years before adoption of either minority provision, it is too remote in time to serve as such. *See City of Mobile v. Bolden*, 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980) (plurality opinion of Stewart, J.). In addition, its concern is limited to the initial admission of blacks to undergraduate schools and perforce does not address discrimination in student government at such schools.

ies involved is the education of the students.[39]

■ 19. The contention by original Defendants that the consent decree in *North Carolina v. Department of Education,* 480 F.Supp. 929 (E.D.N.C.1981) (consent decree entered), authorized the various bodies to adopt the minority provisions is without merit. The consent decree makes no mention of student government at UNC, let alone the minority provisions. Nor is there any other evidence that the parties to the consent decree intended to authorize the minority provisions. Such authorization not shown to be encompassed by the consent decree, the consent decree by its own terms confers no such authority. Consent Decree § III(5), *North Carolina v. Department of Education,* 480 F.Supp. 929 (E.D.N.C.1981) (consent decree entered). The law itself compels this conclusion. As the Supreme Court has recently noted, "the 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.'" *Firefighters Local Union No. 1784 v. Stotts,* — U.S. —, —, 104 S.Ct. 2576, 2586, 81 L.Ed.2d 483 (1984) (quoting *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 [1971]). Moreover, the decree was not approved until more than seven years after adoption of the minority provisions. As indicated *supra,* such *post hoc* authorization does not meet the requirements of *Bakke. Bakke,* 438 U.S. at 294 n. 34, 98 S.Ct. at 2750 n. 34.

### 6. Purposes Other than Remedying Prior Discrimination.

20. The minority provisions also fail to meet the additional requirements of *Bakke*

—that the purposes they purportedly serve other than remedying prior discrimination be permissible and substantial, and that they be a necessary and precise means to achieve such purposes. Defendants do not satisfy this requirement initially because they have not established by contemporaneous evidence or otherwise the particular purpose or purposes which actually motivated adoption of each minority provision.

21. Moreover, of the principal purposes which they allege, each is either impermissible in itself or cannot validly be sought by means of the minority provisions. For instance, an alleged purpose of the minority provision for the Council, supported by language in the provision itself, is to provide "protective representation" to racial minorities, that is, to ensure that a certain minimum number of minority race members serve on the Council. As a goal in itself, this is nothing more than discrimination for its own sake. *Bakke,* 438 U.S. at 307, 98 S.Ct. at 2757. Such discrimination the Constitution does not countenance. *Id.; see also Fullilove,* 448 U.S. at 497, 100 S.Ct. at 2784 (Powell, J., concurring).

22. Among the purported purposes of the Undergraduate Court minority provision is to ensure that its decisions are just, both in actuality and appearance. Ensuring the actual justness of the Undergraduate Court's decisions is clearly a permissible and substantial goal of government. Just as clearly, however, allowing a defendant the option to require that a majority of his judges be of his race does nothing to advance this goal. The notion that a person's race by itself determines his capacity to judge the guilt or innocence of others is unsupportable,[40] particularly here where

---

**39.** The student governmental bodies suffer additional manifest deficiencies: each permits participation by minors; the Council has responsibility for an extremely narrow range of interests compared to the broad concerns of a true legislature; and the referenda do not constitute deliberative bodies at all, but instead aggregations of individuals acting in their personal capacities.

**40.** A portion of original Defendants' evidence suggests, for example, that white students are

unable to judge black students fairly because they do not understand black subculture. Original Defendants' Exhibit No. 7 at 12 & app. G (memorandum reviewing history of guaranteed minority representation on student honor courts at UNC at Chapel Hill) (quoting statement of BSM chairman in support of minority courts). It would seem that any such deficiency could be corrected through appropriate instruction and training, or possibly by providing an advisor knowledgeable in the field to the Undergraduate Court.

there has been no demonstration that the Undergraduate Court has treated defendants unfairly on the basis of race. The well-established precedents of the Supreme Court and the Fourth Circuit proscribing racial discrimination in jury selection unequivocally reject such a notion. *E.g., Alexander v. Louisiana,* 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972); *Swain v. Alabama,* 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965); *Virginia v. Rives,* 100 U.S. 313, 322–23, 25 L.Ed. 667 (1879); *United States v. Jones,* 608 F.2d 1004, 1008–09 (4th Cir.1979), *cert. denied,* 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 773 (1980); *United States v. Mackey,* 474 F.2d 55, 57 (4th Cir.), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2782, 37 L.Ed.2d 401 (1973). The minority provision not being essential to the Undergraduate Court's actually doing justice, it cannot convincingly be argued that the provision is essential to the appearance that the Undergraduate Court is just.

23. It is also contended that the minority provision for the Undergraduate Court serves as a means of revitalizing the honor system of UNC at Chapel Hill. Such revitalization is certainly a permissible interest of the state and possibly even a substantial one, given the first amendment right of a university to make its own judgments regarding education. *See Bakke,* 438 U.S. at 311–15, 98 S.Ct. at 2759–61. However, aside from reassuring students who believe the minority provision to be essential to the Undergraduate Court's fairness, it is not apparent that the minority provision contributes at all to revitalizing the honor system. Moreover, there has been no demonstration that UNC with its vast educational resources could not employ some other means to instill the values of the honor system that are less harmful to the rights of certain students. *See id.* at 316–18, 98 S.Ct. at 2761–62; *Fullilove,* 448 U.S. at 510, 100 S.Ct. at 2791 (Powell, J., concurring). As Justice Powell observed in *Fullilove,* when government seeks "a nonracial goal . . . a nonracial means should be avail-

able to further [it]." *Fullilove,* 448 U.S. at 508, 100 S.Ct. at 2790 (Powell, J., concurring).

24. Another contention made is that the minority provisions for the Council and the Undergraduate Court together advance the interests of increasing the enrollment of minority students at UNC at Chapel Hill by demonstrating that that institution is a hospitable environment for them. There is no evidence other than conclusory statements of university officials that the minority provisions in fact entice minority race members to attend UNC at Chapel Hill.[41] Preferring members of one group for no reason other than race is discrimination for its own sake and as such is impermissible under the Constitution. *Bakke,* 438 U.S. at 307, 98 S.Ct. at 2757; *see also Fullilove,* 448 U.S. at 497, 100 S.Ct. at 2784 (Powell, J., concurring).

25. Another purported purpose of the minority provisions is to promote the diversity of the student body at UNC at Chapel Hill, a permissible and substantial interest of UNC, *Bakke,* 438 U.S. at 311–15, 98 S.Ct. at 2759–61. As *Bakke* recognized, however, classifications such as those in the minority provisions based solely on race do not promote diversity, but actually hinder it by precluding consideration of the non-racial attributes of each candidate for appointment. *Id.* at 315, 98 S.Ct. at 2761.

26. Finally, the argument is made that the minority provisions are necessary to ensure that minority race students enjoy the educational benefits of service on the Council and Undergraduate Court. While this is a permissible and substantial interest of a university, *see id.* at 311–15, 98 S.Ct. at 2759–61, the evidence in the record suggests that the minority provisions are not essential to its realization. Black students have assumed office on both the Council and Undergraduate Court without benefit of the minority provisions. A black student was elected to the highest student office, President of the Student Body, in

---

**41.** A survey of minority race students at UNC at Chapel Hill offered by intervening Defendants actually suggests that the minority provisions do

not attract minority race members to the institution. Intervening Defendants' Exhibit No. 20 at 19 ¶ 8.

1972. Since then at least two other blacks have been elected to the same office. Moreover, other means less harmful to the rights of other students, such as active recruitment of minority race students for the Council and the Undergraduate Court, have not been shown to be ineffective to ensure their participation. *See Bakke*, 438 U.S. at 316–18, 98 S.Ct. at 2761–62; *Fullilove*, 448 U.S. at 510, 100 S.Ct. at 2791 (Powell, J., concurring). The minority provisions, addressed only to service on the Council and Undergraduate Court, are obviously not necessary to achieve educational benefits found in other areas of student government (*e.g.*, service on the Supreme Court of the Student Body, service on appointed commissions, participation in activities open to the student body sponsored by the student government).[42]

27. The minority provisions for both the Council and Undergraduate Court thus fail to meet each requirement of *Bakke*. Such provisions, however well-intentioned, must accordingly be struck down as a denial of Plaintiffs' rights to equal protection of the law under the fourteenth amendment. There has simply been no showing that the deprivation of opportunities inflicted upon Plaintiffs solely because of their race is necessary to achieve a compelling state interest. *Bakke*, 438 U.S. at 320, 98 S.Ct. at 2763; *Fullilove*, 448 U.S. at 498, 100 S.Ct. at 2784 (Powell, J., concurring).

### C. *Class Certification.*

28. The question remains whether this case shall be certified as a class action. The class certification issue, like the case itself, has a long history. The complaint included a request for certification of the class composed of the students in good standing at UNC at Chapel Hill. This court in its initial decision and the Fourth Circuit in its first two decisions found it unnecessary to act on the class certification issue in view of the disposition of the case. Thereafter, on March 23, 1978, Plaintiffs moved for class certification in this court. The court, per Judge Gordon, denied the motion on June 9, 1978, but "without prejudice to the renewal of the same hereafter by the Plaintiffs." On September 6, 1983, at the first day of trial, Plaintiffs orally renewed their motion. It is this renewed motion which is presently before the court.

29. The court finds initially that the motion is untimely. Fed.R.Civ.P. 23(c)(1) provides that the certification issue is to be determined "[a]s soon as practicable after the commencement of an action." In furtherance of this rule, Local Rule 17(b)(3), (5) places upon a party seeking certification the burden of moving for it within ninety (90) days of commencement of the action and, should the court postpone its determination, of renewing the motion at a later date, and of otherwise demonstrating that the requirements for certification have been met. The court's order of June 9, 1978, reaffirmed Plaintiffs' burden of renewing its previously denied motion. Nevertheless, Plaintiffs without explanation did not renew their motion until over five years after its initial denial,[43] in which period two hearings were held—a status conference on May 20, 1983, and the final pre-trial conference on July 22, 1983—at which Plaintiffs also failed to move for class certification.

30. Moreover, in the final pre-trial order, dated July 22, 1983, upon which the court and other parties are entitled to rely under Local Rule 22(*l*)(2), Plaintiffs represented, in effect, that no motion for certifi-

---

**42.** Another purported purpose of the minority provisions is racial integration of sororities and fraternities at UNC at Chapel Hill. Although this goal is permissible and possibly substantial, the minority provisions are obviously not a necessary means to achieve it and, indeed, there is no evidence to suggest they would contribute at all to its realization.

**43.** Although on three occasions during this period complaints in intervention requesting class certification were either filed or adopted, these complaints did not satisfy the Local Rule 17(b)(3) motion requirement. In any case, because they were filed or adopted around the start of the delay period (June 9, 1978, and June 14, 1979) or at the very end (July 5, 1983) and not followed up promptly by Plaintiffs, it is questionable whether they would assist Plain-

cation would be made,[44] omitted class certification from the list of issues to be resolved at trial, and otherwise made no mention of the class certification issue. It is obvious that Plaintiffs' action deprived the other litigants in this case of any meaningful opportunity to respond at trial to their motion for certification. *See generally Chambers v. McLean Trucking Co.*, 550 F.Supp. 1335, 1345 (M.D.N.C.1981) (Ward, J.) (court implicitly recognizes prejudice to other parties caused by untimeliness of certification motion as grounds for denial of certification but finds no prejudice occurred); *Brown v. J.P. Allen Co.*, 79 F.R.D. 32, 34 (N.D.Ga.1978) (same).

31. In addition, Plaintiffs' action would serve to prolong this litigation, if a determination of class certification were still to be undertaken. Additional briefing and an additional hearing would be required [45] to provide both groups of Defendants their opportunity to be heard, and to assist the court in making the requisite "rigorous analysis" of the certification issues presented.[46] *General Telephone Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2373, 72 L.Ed.2d 740 (1982). Such prolongation of this lengthy litigation at this late date can scarcely be tolerated. *See Walker v. Columbia University*, 62 F.R.D. 63, 64 (S.D.N.Y.1973); *Adise v. Mather*, 56 F.R.D. 492, 494–95 (D.Colo.1972).

32. There is, in any event, no compelling need for class certification in this case. As the Fourth Circuit has recognized previously in this litigation and as the intervening Plaintiffs themselves conceded in each of their briefs in support of intervention,[47] the relief in injunctive and declaratory suits against governmental agencies like the instant suit, if granted, is essentially the same whether or not certification is approved. *Uzzell v. Friday*, 547 F.2d 801, 805 n. 7 (4th Cir.1977) (quoting *Potts v. Flax*, 313 F.2d 284, 289 [5th Cir.1963]), *vacated on other grounds*, 438 U.S. 912, 98 S.Ct. 3139, 57 L.Ed.2d 1158 (1978); *Eagle v. Koch*, 471 F.Supp. 175, 177 (S.D.N.Y.1979) (in cases like the instant one "class action designation is merely a formality"). Although certification can be used to avoid mootness, *see Adams v. Califano*, 474 F.Supp. 974, 979 (D.Md.1979), *aff'd sub nom. Adams v. Harris*, 643 F.2d 995 (4th Cir.1981), the potential mootness here posed by graduation of the named Plaintiffs has heretofore been managed successfully, even with the extensive appellate proceedings, through intervention. Intervention would appear to be the appropriate means to resolve any further mootness problems, particularly since both groups of Defendants have indicated to the court a willingness to consent to future interventions. *See Hill v. Western Electric Co.*, 672 F.2d 381, 387 (4th Cir.), *cert. denied*, 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982); *Brink v. Da Lesio*, 667 F.2d 420, 428–29 (4th Cir.1981). Certification here would simply not advance " 'the efficiency and economy of litigation which is a principal purpose of the procedure,' " *General Telephone Co. v. Falcon*, 457 U.S. at 159, 102 S.Ct. at 2372 (quoting *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 [1974]), but instead would needlessly complicate and hinder it. For this reason and the other reasons set forth above, the mo-

---

tiffs significantly in avoiding a finding of tardiness.

**44.** "There are no pending or impending motions ... except as to the ruling of the court on the intervenors' motion to substitute additional parties defendant." Order on Final Pre-Trial Conference at 15 ¶ 20.

**45.** It would be inadequate for the court to rely on the briefs and hearing relating to the March 23, 1978, motion for certification due to, among other considerations, the passage of time. In any case, there is no transcript of the hearing, which was held before Judge Gordon.

**46.** Among these issues is whether there exists antagonism between the named Plaintiffs and the other members of the purported class disqualifying them as adequate class representatives. *See generally Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *Dierks v. Thompson*, 414 F.2d 453, 456–57 (1st Cir.1969). Evidence suggesting possible antagonism includes the strong votes in favor of each minority provision in the respective referenda on them.

**47.** *E.g.*, Brief [in Support of Motion to Intervene] at 9 (April 15, 1983).

tion for class certification will be denied. *See, e.g., Coffin v. Secretary of Health, Education, and Welfare,* 400 F.Supp. 953, 956–57 (D.D.C.1975) (three-judge panel), *appeal dismissed,* 430 U.S. 924, 97 S.Ct. 1539, 51 L.Ed.2d 789 (1977); *Edwards v. Schlesinger,* 377 F.Supp. 1091, 1093 (D.D. C.), *rev'd on other grounds sub nom. Waldie v. Schlesinger,* 509 F.2d 508 (D.C.Cir. 1974).

### D. *Evidentiary Objections.*

33. Finally, the court shall delineate the evidence it has considered in making its findings and conclusions. At trial multiple objections were raised to portions of each party's evidence, namely: that portions of Plaintiffs' and intervening Defendants' evidence are inadequately noticed under Local Rule 22, which requires, among other things, that parties list their exhibits in a proposed pre-trial order; that portions of each party's evidence are irrelevant; that portions of Plaintiffs' evidence are beyond the scope of original Defendants' case in chief; and that portions of intervening Defendants' evidence are beyond the scope of the Fourth Circuit's remand, incompetent as nonexpert opinion, violative of the original document rule, and inadmissible as hearsay. Each objection shall be overruled.

▆▆▆▆ 34. With respect to the Local Rule 22 objection,[48] the court finds that any prejudice the parties suffered was minimal. All Defendants candidly acknowledge that they had previously seen all the evidence to which they raise this objection, which con-

sists primarily of records from UNC at Chapel Hill and discovery in this case. Moreover, the court granted all Defendants leave to respond in writing after trial to any of this evidence. None responded. Plaintiffs did not request a similar opportunity, and appear to concede the admissibility of this evidence in their proposed conclusions of law. The irrelevancy objection fails because the evidence challenged[49] relates to whether there exist findings sufficient under *Bakke* to support UNC's adoption of the minority provisions, whether the minority provisions have been utilized since their adoption, and other issues relevant to this litigation. Plaintiffs' evidence on such issues[50] is not impermissibly broad in scope because such issues were also addressed in original Defendants' evidence.

▆▆▆▆ 35. With regard to the scope of the remand,[51] the court finds that the Fourth Circuit's goal of full development of the record encompasses the introduction of evidence by intervening Defendants, who as student leaders presented relevant information on, among other things, utilization of the minority provisions. The incompetency objection[52] is without merit because the statements challenged consist of either first-hand observations by persons involved to some degree with race relations at UNC at Chapel Hill, or opinions of such persons which are sufficiently related to their observations to permit admission of the opinions into evidence. *See* Fed.R.Evid. 702. The court shall take judicial notice pursuant to Fed.R.Evid. 201 of certain exhibits[53] comprising records from court and adminis-

---

**48.** Plaintiffs make this objection to intervening Defendants' Exhibits No. 19–21. The original Defendants make this objection to Plaintiffs' Exhibits No. 1A (excluding ¶ 1), 1B, 1E–1H, 2A (excluding ¶ 3), 2B–2V and 3. The intervening Defendants make this objection to Plaintiffs' Exhibits No. 1A (excluding ¶ 1), 1B, 1E–1G, 2A (excluding ¶ 3) and 2B–2V.

**49.** Plaintiffs make this objection to original Defendants' Exhibits No. 8, 9A, and 10, and to intervening Defendants' Exhibits No. 1–14 and 18 (marked as original Defendants' Exhibit 8), and 19–25. The original Defendants make this objection to Plaintiffs' Exhibits No. 2A (excluding ¶ 3), 2B–2V, and to intervening Defendants' Exhibits No. 1–13 and 18–25.

**50.** The original Defendants make this objection to Plaintiffs' Exhibits No. 2A (excluding ¶ 3), and 2B–2V.

**51.** Plaintiffs make this objection to each exhibit offered by intervening Defendants and to the testimony of their witnesses.

**52.** Plaintiffs make this objection to intervening Defendants' Exhibits No. 1–4, 6, 7, 10, 19, and 21.

**53.** Intervening Defendants' Exhibits No. 8, 10, and 21. The instant objection to these exhibits is made by Plaintiffs.

trative proceedings involving UNC and of orders referenced therein from such proceedings, which references are claimed to violate the original document rule of Fed.R. Evid. 1002. Finally, the material challenged as hearsay [54] is not inadmissible as such.

## IV.

## CONCLUSION

For the foregoing reasons, the court shall enter judgment for Plaintiffs on the third, fifth, ninth, and eleventh causes of action in the original complaint, and the first, third, fifth, and seventh causes of action in the two complaints in intervention (causes of action framed as class actions being treated as claims by Plaintiffs in their individual capacities only) and shall deny with prejudice the motion of original Defendants for dismissal of the case. The other causes of action set forth in the complaints not previously adjudicated shall be dismissed with prejudice, as indicated *supra*. An appropriate order shall also issue declaring the minority provisions to be in violation of the equal protection clause of the fourteenth amendment and enjoining the original Defendants from enforcing them or like provisions.

## JUDGMENT

This case came before the court for trial without a jury on remand from the United States Court of Appeals for the Fourth Circuit. For the reasons set forth in the Memorandum Opinion filed contemporaneously herewith, the court has determined that the motion of Plaintiffs to dismiss voluntarily their claims alleging violations of 42 U.S.C. § 2000d should be granted; that the other pending motions should be denied; and that judgment should be entered for Plaintiffs on their remaining claims and that they should be provided declaratory and injunctive relief.

NOW, THEREFORE, IT IS ORDERED that the motion of Plaintiffs filed September 12, 1983, to dismiss their claims alleging violations of 42 U.S.C. § 2000d is **GRANTED**; and that the fourth, sixth, tenth, and twelfth causes of action in the initial complaint, filed June 13, 1974, and the second, fourth, sixth, and eighth causes of action in the complaints in intervention, filed June 9, 1978, and June 14, 1979, respectively, are **DISMISSED**;

IT IS FURTHER ORDERED that the oral motions made at trial by Plaintiffs to dismiss intervening Defendants and for certification of the instant case as a class action, and the oral motions made at trial by the original Defendants to dismiss Defendant William C. Friday and to dismiss the case are **DENIED**;

AND IT IS FURTHER ORDERED that judgment is **GRANTED** for Plaintiffs on the third, fifth, sixth, and eleventh causes of action in the aforesaid initial complaint, and on the first, third, fifth, and seventh causes of action in the aforesaid complaints in intervention (causes of action framed as class actions being treated as claims by Plaintiffs in their individual capacities only);

AND IT IS FURTHER ORDERED that the provisions in Article I, Section 1.D of the Student Constitution of the University of North Carolina at Chapel Hill (UNC at Chapel Hill) which require the appointment of students to the Campus Governing Council at that institution on the basis of race, and the provisions in Section IV.C.2(a) and (e)(2) of the Instrument of Student Judicial Governance for UNC at Chapel Hill which require the appointment of students to the Undergraduate Court of that institution on the basis of race are **DECLARED** to violate on their face and in their application the equal protection clause

---

**54.** Plaintiffs make this objection to intervening Defendants' Exhibits No. 13 (North Carolina statutes of which the court shall take judicial notice), 20 (summary of voluminous records under Fed.R.Evid. 1006), and 22 & 23 (affidavits adopted by witnesses at trial). The original Defendants make this objection to intervening Defendants' Exhibits No. 19 (report prepared by faculty committee in regular course of its activities within the meaning of Fed.R.Evid. 803[6] ), 20, and 21 (affidavit from court records of which court has taken judicial notice *supra* note 53).

of the fourteenth amendment of the United States Constitution;

AND IT IS FURTHER ORDERED that original Defendants, their successors, agents, attorneys, employees, and those in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise are permanently **RESTRAINED** and **ENJOINED** from enforcing the aforesaid provisions in the Student Constitution and Instrument of Student Judicial Governance, and from adopting, implementing, or enforcing any other regulations, practices, or procedures, or allowing the adoption, implementation, or enforcement of any other regulations, practices, or procedures which deny students consideration for appointment to the Campus Governing Council or Undergraduate Court at UNC at Chapel Hill solely on the basis of their race.