Robert C. PETERS, Plaintiff,

v.

Preston MOSES, et al, Defendants.

Civ. A. No. 84-0091-D.

United States District Court,
W.D. Virginia,
Danville Division.

May 17, 1985.

W. Carrington Thompson, Luis A. Abreu, Clement & Wheatley, Danville, Va., for Robert C. Peters.

David B. Worthy, Stone & Worthy, Martinsville, Va., for Preston Moses, et. al.

## MEMORANDUM OPINION

KISER, District Judge.

This is an action arising out of a refusal by the Pittsylvania County, Virginia School Board Selection Commission (hereinafter "SBSC") to consider the Plaintiff for a seat on the School Board of Pittsylvania County, Virginia (hereinafter "Board") because of his race. The Plaintiff, Robert C. Peters, a white male, on June 19, 1984, appeared before the SBSC to offer himself as a candidate for school board appointment. After being nominated for one of two at-large vacancies on the Board, Defendant Preston Moses, Chairman of the SBSC, stated that the at-large seats were reserved for members of the black community. As a consequence of this policy, the SBSC

refused to consider the nomination of Peters, and this action ensued.

Jurisdiction is proper in this Court by virtue of 28 U.S.C. § 1343 and 42 U.S.C. §§ 1983, 1985 and 1986. The Plaintiff is seeking both legal and equitable relief. He seeks to have the alleged discriminatory practices enjoined and also seeks compensatory and punitive damages. The Defendants in this action are the Chairman and other members of the SBSC; they are Preston Moses, Chairman; Gladys W. Carter; J. Lemuel Carter; J. Allen Cook; Marshall H. Kendall; R. Louis Short and J. Leland Williams. This case was tried before and submitted to a jury on a special verdict. The only issues submitted to the jury on the special verdict were: (1) whether the SBSC was restricting the two at-large seats on the School Board to blacks pursuant to a recommendation of the Pittsylvania County Board of Supervisors; (2) whether the Defendant Moses had acted in subjective bad faith; and (3) assuming that the Court determined that Peters' rights were violated, the total amount of damages suffered by him. The jury found that the SBSC was carrying out the wishes of the Board of Supervisors, that Moses was not acting in subjective bad faith and further awarded damages of $5,000 compensatory and $5,000 punitive. In addition to denying liability, Moses raised the defense of qualified immunity. Based on the jury's resolution of the material facts which underlie the claim of the constitutional deprivation, it is the Court's task to decide as a matter of law whether the Plaintiff's constitutional rights were violated, and if so, whether Moses' defense of qualified immunity to Plaintiff's demand for monetary damages is valid. And, finally, the Court must determine whether the Plaintiff is entitled to any equitable relief.

## A. *Background*

Before reaching the facts of this case and an analysis of the legal issues presented, a brief review of Virginia law that governs school board appointments is required. The General Assembly of Virginia has established alternative methods of selecting school board members in school divisions composed of a single county.[1] The Pittsylvania County school division, a single county division, selected the procedure whereby the school board members are appointed by an independent School Board Selection Commission ("SBSC").[2]

The SBSC, which is charged with making school board appointments, is composed of one member from each election district of the county, and these individuals are themselves appointed by the Circuit Court of Pittsylvania County, Virginia. Va.Code § 22.1–35 1950, as amended. They serve four (4) year terms. Whenever vacancies occur on the Pittsylvania County School Board whether by expiration of natural term, resignation or death, the SBSC is authorized to give public notice of their meetings at which time the appointments will be made. Va.Code § 22.1–35 *et. seq.* 1950.

It has been common practice in Pittsylvania County for the SBSC to hold two meetings when filling a vacancy on the Board. The first session typically is held one day prior to the day noticed for the actual appointments. Normally, at this interview session, the potential nominees appear before the SBSC to briefly introduce themselves and to answer any questions which might be addressed to them. These same or additional individuals then appear before the SBSC on the following day at which time the formal nomination and appointment takes place. The facts, which give rise to this action, occurred at one of these nominating meetings and will be addressed in greater detail later in the opinion.

The Pittsylvania County School Board is comprised of twelve members. There is one member from each of the seven magisterial districts, one from each of the three incorporated towns in the county, and two members selected from the county at

---

1. Articles Two (2) and Three (3) of Chapter Five (5) of Title 22.1, Code of Va. 1950, as amended.

2. This procedure is explained in detail in Va. Code § 22.1–34, *et seq.*, 1950, as amended.

large.[3] The present controversy arises out of these latter two seats.

The Code of Virginia grants the governing body of a county, in this case a board of supervisors, the authority to authorize the SBSC to appoint no more than two members from the county at large. Va. Code § 22.1–36 1950, as amended. The Board of Supervisors is also responsible for making financial appropriations to the school system; however, this is the limit of their control.[4] The SBSC is a completely autonomous body. The Supervisors of Pittsylvania County had, in fact, exercised the option to enlarge school board representation. The evidence indicated that on December 6, 1971, the Board of Supervisors unanimously passed a resolution authorizing the then School Trustee Electoral Board (now "SBSC")[5] to appoint two members at large to the Pittsylvania County School Board. As a supplement to their resolution, the Board of Supervisors also approved the following recommendation:

> Further, the Board of Supervisors of Pittsylvania County, Virginia, at the above time and meeting place as supplement to the above resolution doth resolve, request and recommend to the Pittsylvania County School Trustee Electoral Board for their consideration that the two additional members to be appointed from the County of Pittsylvania at large be two qualified citizens from the Black Community of Pittsylvania County.

Defendant's Exhibit # 5.

This action by the Supervisors did not have, nor was it intended to have, any binding, legal effect on the SBSC. It was a mere recommendation and nothing more.

Mr. James Kent, an attorney from Altavista, Virginia, was a member of the Board of Supervisors at the time the resolution was adopted and was responsible for making the motion which was unanimously approved. While testifying in this case, Mr. Kent stated that the resolution was bifurcated. The first portion of the resolution, which authorized the creation of the seats at-large, *was* legally binding on the SBSC. He testified that the second portion of the resolution, which requested that the two at-large seats be filled by qualified citizens in the black community, *was not* legally binding. As noted earlier, the SBSC was and is a totally independent body not subject to control by any other local governing entity. Therefore, the Supervisors could not compel the SBSC to follow this recommendation. As Mr. Kent indicated, the latter portion of this resolution was an effort by the Supervisors to respond to increasing pressure from the black community to provide some black representation on the Board. The undisputed evidence was that no black had ever served on the School Board prior to this resolution. Although this provision was not legally binding on the SBSC, it adhered to it faithfully. In fact, it is the Defendants' position that these seats are reserved for blacks and no white will be appointed to them.

## B. *Facts*

Mr. Peters, a resident of the Tunstall Magisterial District of Pittsylvania County, Virginia, was nominated and appointed as the Tunstall representative on the Pittsylvania County School Board in 1980. His appointment was for a four-year term which commenced on July 1, 1980 and ex-

---

3. While the issue is not properly before the Court and bears no direct relevance to the case at hand, the statutory basis for the *twelve* member school board instead of a nine member board is ambiguous. *See Va. Code* §§ 15.1–571.-1(C); 22.1–36, 1950, *as amended.*

4. While the Board of Supervisors has power to appropriate the money for the operation of the school system, their control goes only to the entire amount. There does not exist a line item veto.

5. The name was changed from the School Trustee Electoral Board to the School Board Selection Commission in 1980 when the General Assembly rearranged, amended and recodified the laws of Virginia relating generally to education by repealing former Title 22 of the Code and enacting the present Title 22.1 Education. Acts of the General Assembly of Virginia, 1980 Session, Chapter 559.

pired on June 30, 1984. Three seats, including Mr. Peters' Tunstall seat, came up for reappointment in June of 1984. The SBSC met twice to make the appointments. At the first meeting or interview session on June 18, 1984, it became apparent that Mr. Peters would have opposition for the Tunstall seat. The Plaintiff testified that the SBSC seemed hostile to him at the interview session and that it was obvious to him that he would not be reappointed to the Tunstall seat. In fact, he was not reappointed.[6]

On June 19, 1984, the SBSC held a public meeting to make the appointments for the three vacancies, the Tunstall seat held by Mr. Peters, the Town of Hurt seat, and one of the at-large seats traditionally held by a black citizen. Nominations were taken for all of the vacancies before the actual selection took place. The SBSC accepted nominations for the Tunstall seat first. Peters and Ronald Williams were nominated for this vacancy, and then one person was nominated for the Hurt seat. The final item of business was to receive nominations for the at-large seat. Koyeton Beavers was nominated; he is a black male who had previously occupied the seat.

At this point in the proceedings, Tom Gatewood stated he wished to nominate both Peters and Williams for the at-large seat. Moses was aware that there might be an effort to have Peters appointed to the at-large seat; so he had armed himself with a copy of the minutes of the 1971 Board of Supervisors meeting which contained the above-quoted resolution. When Gatewood attempted to place the names of

Peters and Williams into nomination, Moses informed Gatewood that he was out of order. Moses told Gatewood that the resolution called for the seats to be held by blacks and that Mr. Peters did not qualify for the at-large seat. Gatewood asked to see a copy of the resolution which Moses gave him. While Gatewood reviewed the resolution, the SBSC proceeded to cast their votes. Williams was appointed to the Tunstall seat, and Beavers was unanimously appointed to the at-large seat. Gatewood informed Moses that the resolution only recommended that the seats be held by blacks and that it was not mandatory. Moses stated to Gatewood that the resolution "called for" a black representative. At any rate, Peters was not considered. In fact, Moses testified that neither Peters nor Williams were qualified for the at-large seat because of their race, and he further stated that he never asked if there were any votes for Peters.

The testimony from numerous witnesses indicated that Peters was not considered by the SBSC as a candidate for the at-large seat. The jury also found this. One of the questions addressed to them was whether the SBSC in reserving the seats had it as their intent to follow the recommendation set forth in the 1971 resolution. The jury responded affirmatively thereby indicating that no white was considered for this seat.[7] The Court agrees with this finding. I conclude that Peters was in fact denied consideration for the at-large seat on the basis of his race. It is this denial from consideration which forms the *sole* basis for this law suit. The question now is whether that

---

6. The evidence revealed that a right had developed between Peters and Moses and that this was probably the reason Peters was not reappointed to the Tunstall seat. Whether this is true or not is irrelevant to the issues in this case. It may well be that the Tunstall seat was lost by the Plaintiff because of personal or political differences between him and one or more of the Defendants. This is irrelevant. This suit is not predicated on the loss of the Tunstall seat, but upon the loss of the right to be considered for the at-large seat. I believe, and so find, that the political and personal differences that existed between the Plaintiff and the Defendants played no part in denying the Plaintiff the right

to be considered for the at-large seat. I think this is also supported by the jury's finding in the special verdict when it found that there was no subjective bad faith in denying the Plaintiff the opportunity to be considered for the at-large seat.

7. Question No. 1 on Special Verdict.

1. In reserving the at-large seats on the school board was it the intent of the School Board Selection Commission to carry out the recommendation set forth in the 1971 resolution of the Board of Supervisors?

Yes.

denial violated any right guaranteed by the Constitution, and if so, whether he is entitled to relief.

After being refused consideration for the at-large seat, Peters filed this action alleging that he had been denied consideration for a public office on the basis of his race and race alone, and that this denied him equal protection of the laws as required by the Fourteenth Amendment of the United States Constitution. To borrow a phrase developed in the last decade in this area of the law, Peters argues that he has been the victim of "reverse discrimination", and in so arguing, he places great reliance on the opinions of the United States Supreme Court announced in the cases of *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Fullilove v. Klutznick, Secretary of Commerce*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). The Defendants in opposition argue that the *Bakke* and *Fullilove* decisions are inopposite to the present case and that the good faith qualified immunity defense bars any claims raised by Peters for monetary damages. I address both the equal protection and the good faith immunity issues.

## C. *Conclusions of Law*

### PART I

■ I am called upon to determine whether the actions of the Defendants in reserving exclusively for blacks the two at-large School Board seats violates the Equal Protection Clause of the Fourteenth Amendment. In undertaking this task, I have looked to the cases of *Bakke, supra,* and *Fullilove, supra,* for guidance from the Supreme Court, but unfortunately in those opinions the court speaks not as the Court with one voice but rather as individual justices with many voices. While the various approaches are all insightful, the voice that I find the most persuasive is that of Mr. Justice Stewart in his dissent in *Fullilove.* I find no exposition of these cases by the Fourth Circuit, but two of my brothers of the District Courts in the Fourth Circuit have listened to a different voice, that of Justice Powell but with opposite results.[8]

The exact words that I am called upon to apply to the facts of this case are: "No state shall ... deny to any person the equal protection of the laws." U.S. Constitution, Fourteenth Amendment, § 1. It has been held that the Equal Protection Clause creates a personal right that guarantees to the individual that he will receive equal treatment at the hands of government. "The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights." *Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948). Although the Clause permits rational classifications, *Railway Express Agency v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949), it forbids classifications based on race.

> Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color.

*Shelley*, 334 U.S. at 23, 68 S.Ct. at 847 (1948).

In the same vein, over thirty years later, Mr. Justice Stewart stated:

> [Our] cases have made clear that the Constitution is wholly neutral in forbidding such racial discrimination, *whatever the race may be of those who are its victims. Fullilove*, 448 U.S. at 524 [100 S.Ct. at 2798] (Stewart, J., dissenting) (emphasis added).

> Under our Constitution, the Government may never act to the detriment of a person solely because of that person's race. The color of a person's skin and the country of his origin are immutable facts that bear no relation to ability, disadvantage, moral culpability, or any oth-

---

**8.** *See, Uzzell, et al v. Friday, et al.,* 592 F.Supp. 1502, 1517 (M.D.N.C.1984); *J.A. Croson Compa-* *ny v. City of Richmond,* 84–0021–R (E.D.Va. 12/3/84).

er characteristics of constitutionally permissible interest to the Government. 'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' *Hirabayashi v. United States,* 320 U.S. 81, 100 [63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943)], quoted in *Fullilove,* 448 U.S. at 525 [100 S.Ct. at 2799] (Stewart, J., dissenting).

In short, racial discrimination is by definition invidious discrimination. *Id.* at 526 [100 S.Ct. at 2799].

*The rule cannot be any different when the persons injured by a racially biased law are not members of a racial minority. Id.* at 526 [100 S.Ct. at 2799] (emphasis added).

To attempt to correct past discrimination against blacks by a policy of discriminating against whites is somewhat akin to the thinking that two wrongs make a right. Not only is such thinking illogical, it is constitutionally impermissible. As the Court has noted: "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." *Shelley v. Kraemer,* 334 U.S. at 22, 68 S.Ct. at 846.

The fact that the discrimination is well-intended or laudable in its objectives does not except it from the prohibition of the Equal Protection Clause. Perhaps no more laudable end can be sought by government than the protection and welfare of its children. Yet, when a Florida court decided it would be detrimental to a white child to subject her to the societal taunts and pressures which would result from granting custody to her mother who was married to black man, the Supreme Court, while agreeing with the Florida court that the child would be subjected to unjust social pressure, overturned the Florida court and awarded custody to the mother. In so doing, the court said:

A core purpose of the Fourteenth Amendment was to do away with all governmentally-imposed discrimination based on race.

*Palmore v. Sidoti,* 466 U.S. 429, ——, 104 S.Ct. 1879, 1881, 80 L.Ed.2d 421, 425 (1984).

I am in agreement with this principle. No matter how well-intended, benign or practical, the Fourteenth Amendment was not designed to condone racial preferences.

From the evidence in this case, there is no question in my mind that the initial intent of the SBSC was to alleviate the historical discrimination which had long existed on the School Board by setting aside the two at-large seats for black members. In doing this, several worthwhile objectives were accomplished. It improved community relations between the blacks and whites by assuring blacks seats on the Board; it placed black members on the Board who had greater rapport with the black community and thereby encouraged black participation in school affairs. It is entirely reasonable that black citizens might be more apt to express their concerns and ideas to black School Board members, but more importantly, black School Board members would be more sensitive and compelling in expressing these concerns and ideas to the Board as a whole. It gave a greater sense of security and acceptance to the black professional educators particularly in the areas of hiring, firing, promotion and discipline, and it gave to the black students of the school system a greater sense of belonging.[9]

■ All of these are laudable reasons and worthy objectives, but nonetheless, it is violative of the Equal Protection Clause to maintain them by a classification based solely on race. It is patently wrong to attain them at the expense of the Plaintiff because "from the perspective of a person detrimentally affected by a racially discriminatory law, the arbitrariness and unfairness is entirely the same, whatever his skin color and whatever the law's purpose, be it purportedly 'for the promotion of the public good' or otherwise." *Fullilove,* 448 U.S. at 526, 100 S.Ct. at 2799 (Stewart, J., dissent-

---

**9.** Another very practical purpose is that the two seats set aside in likelihood prevented a discrimination suit by the NAACP to assure black representation on the board.

ing). Moreover, "[t]he Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals." *Shelley v. Kraemer,* 334 U.S. at 22, 68 S.Ct. at 846.

> [T]he guarantee of equal protection immunizes from capricious governmental treatment 'persons'—not 'races'—it can never countenance laws that seek racial balance as a goal in and of itself. 'Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids.'

*Fullilove,* 448 U.S. at 529, 100 S.Ct. at 2801 (Stewart, J., dissenting), quoting *Bakke,* 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (Powell, J., concurring).

Appealing arguments are made that where there has been a long history of discrimination against blacks a strong affirmative action program favoring blacks is necessary to eradicate the past discrimination, and it is constitutionally acceptable that some whites may have to suffer in the process even though the white individual who must suffer bore no responsibility for the past discrimination.[10] Indeed, affirmative action has been successful and lawful in many contexts: school desegregation, *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); and employment discrimination, *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). However, these situations are inapposite to the case at hand. In the school desegregation cases, there was no penaliz-

ing of the majority class. It was a matter of extending to the minority class the same rights enjoyed by the majority. In the employment cases, many involved private employers to whom the Equal Protection Clause did not apply. More importantly, in all of these cases affirmative action was ordered by a court which fashioned an equitable remedy to fit a specific need. And, as these cases indicate, there is substantial authority for a court to incorporate a racial or ethnic criteria in fashioning an equitable remedy to an established violation. This authority, however, does not extend to all other governmental bodies. As Justice Stewart in his dissenting opinion in *Fullilove* noted, "[t]he Legislative Branch of government is not a court of equity. It has neither the dispassionate objectivity nor the flexibility that are needed to mold a race-conscious remedy around the single objective of eliminating the effects of past or present discrimination." *Fullilove, supra,* 448 U.S. at 527, 100 S.Ct. at 2800 (Stewart, J., dissenting).

In contrast, here the SBSC has adopted a policy of reserving two out of twelve seats for blacks and foreclosing whites and members of other races from consideration for the seats. Thus, unlike the school and employment cases, the policy is implemented at the expense of any white individual who has an interest in the at-large seats on the School Board. Moreover, the policy is at best an arbitrary set aside because it bears absolutely no statistical correlation to the black population of Pittsylvania County generally or to the black population in the schools. Nor are there any other stated criteria such as being tied to a magisterial district or a town, rather the seats are purely at large.[11] In fact, the set aside smacks of tokenism.

---

**10.** "The natural consequence of our governing processes may well be that the most 'discreet and insular' of whites ... will be called upon to bear the immediate, direct costs of benign discrimination." *Bakke,* 438 U.S. at 361, 98 S.Ct. at 2784 (*Brennan,* J., dissenting); "When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such 'a sharing of the burden' by innocent parties is not

impermissible." *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2778.

**11.** The Board of Supervisors was apparently unwilling to take the political risk of designating a specific district or town to be represented on the Board by a black.

When racial discrimination occurs, it hurts not only the individual but society. This case is a good example of that. Although the avowed purpose of the two seat set aside for the blacks was to benefit the black community by alleviating to some degree past discrimination, it has become a detriment to the black community. "[R]acial discrimination, even 'good faith' racial discrimination, is inevitably a two-edged sword." *Fullilove, supra* at 531, 100 S.Ct. at 2802 (Stewart, J., dissenting). As in most quotas, it has become a floor below which the number of black members on the Board will not fall and a ceiling above which the number of black members will not rise. "[P]referential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth." *Bakke, supra* 438 U.S. at 298, 98 S.Ct. at 2752 (Powell, J., concurring).

There is yet perhaps a more fundamental reason why I believe the two seat set aside serves as a detriment to the black community of Pittsylvania County, and that is a concern which was thoughtfully expressed in the dissenting opinion of Justice Stewart in *Fullilove, supra*. "Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). A governmental body, and in this case the SBSC, through its example "teaches the public that apportionment of rewards and penalties can legitimately be made according to race—rather than according to merit or ability—and that people can, and perhaps should, view themselves and others in terms of their racial characteristics. Notions of racial entitlement will be fostered, and private discrimination will

necessarily be encouraged." *Fullilove,* 448 U.S. at 532, 100 S.Ct. at 2802 (Stewart, J., dissenting). This case illustrates graphically not only the folly but also the danger of governmental decisions being made on the basis of race.

I have made no attempt to address all of the legal nuances as to when governmental action may or may not be based on racial considerations; these issues are not before me. I am faced with the single issue of an individual who was categorically excluded from consideration for appointment to public office *solely* because of the color of his skin. I am convinced that the Equal Protection Clause forbids this type of racial exclusion. Consequently, the SBSC's policy which permits the appointment of blacks only to the at-large seats of the Pittsylvania County School Board and excludes from consideration for these seats members of any other race must be discontinued.

## PART II

Contrary to the urgings of Plaintiff in this case and to the positions taken by my two brethren at the District Court level, I have chosen not to follow the mode of analysis enunciated by Mr. Justice Powell in his concurring opinions in *Bakke* and *Fullilove*. I do not believe that Justice Powell's concurring opinion represents the court's opinion in *Bakke* with regard to this matter. Nevertheless, even were I to apply Justice Powell's analysis, the result in this case would be exactly the same.

In both the *Bakke* and *Fullilove* opinions, Justice Powell stated that racial classifications even when used in a benign way should be subjected to strict scrutiny.[12] In order for a racial classification to survive strict scrutiny "a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary ... to the accomplishment' of its pur-

---

**12.** "Racial and ethnic classifications, however, are subject to stringent examination without regard to these additional characteristics [i.e., discreteness and insularity.]" *Bakke*, 438 U.S. at 290, 98 S.Ct. at 2748 (Powell, J., concurring).

"Racial classifications must be assessed under the most stringent level of review because im-

mutable characteristics, which bear no relation to individual merit or need, are irrelevant to almost every governmental decision." *Fullilove*, 448 U.S. at 496, 100 S.Ct. at 2784 (Powell, J., concurring).

pose or the safeguarding of its interest." *Bakke, supra,* 438 U.S. at 305, 98 S.Ct. at 2756 (Powell, J., concurring). After determining that strict scrutiny was the standard by which benign racial classification should be reviewed, Justice Powell proceeded in *Bakke* to consider the stated purposes of the special admissions program to determine which, if any, justified the use of the racial classification.

Following this line of analysis, there are numerous reasons why the Pittsylvania County officials might want the two seat set-aside. These are discussed earlier in this Opinion. *Supra,* p. 1333. They are, very briefly, to remedy past discrimination, to insure input from the black community and to provide representation for black professionals in the system. In accordance with the Powell formula of analysis these purposes must be examined to determine if, singularly or collectively, they are substantial enough to support use of suspect criteria. *Bakke,* 438 U.S. at 306, 98 S.Ct. at 2756.

The first purpose identified is the remedying of past discrimination. Justice Powell acknowledged that "[g]overnment does have a legitimate interest in ameliorating the disabling effects of identified discrimination. ... But this Court has never approved race-conscious remedies absent judicial, administrative, or legislative findings of constitutional or statutory violations." *Fullilove,* 448 U.S. at 497, 100 S.Ct. at 2784 (Powell, J., concurring). He went on to note that before a race conscious *remedy* could be imposed to ameliorate past discrimination that two conditions had to be satisfied:

1. the governmental body attempting to impose a race-conscious remedy must have the authority to act in response to identified discrimination;

2. the governmental body must make findings that demonstrate the existence of illegal discrimination.

*Id.* at 498, 100 S.Ct. at 2785.[13]

No matter how well intentioned or benign the classification, if it does not satisfy the criteria set forth by Justice Powell above it cannot be used as a means of remedying past discrimination. I do not believe that the SBSC satisfies either element of Justice Powell's test.

■ The SBSC is not a body with authority to act in response to identified discrimination. Their task as created by the legislature of the Commonwealth of Virginia is to make appointments to the school board. To borrow from Justice Stewart's dissenting opinion in *Fullilove* where he was discussing Congress' ability to act in response to discrimination, the SBSC is not a court of equity. Should the SBSC in the exercise of their discretion choose to appoint a black to the School Board, then that is a matter purely within the ambit of their authority; however, they do not have the authority to formulate and administer race conscious programs to remedy past discrimination. Whether the Board of Supervisors, the Circuit Court of Pittsylvania County, or the Virginia General Assembly would have that authority is not for me to decide in this case; it is clear that the SBSC does not have this power.

Moreover, the action taken by SBSC also fails because it does not satisfy the second prong of the test. In *Bakke,* Justice Powell concluded that the Regents were not empowered to conduct the necessary investigation and make findings with regard to past discrimination and in fact they had not done so. *Bakke, supra* 438 U.S. at 309, 310, 98 S.Ct. at 2757, 2759 (Powell, J., concurring). The SBSC's authority and action are similarly flawed. There was no investigation and no finding by the SBSC of discrimination; it simply followed the recommendation of the Board of Supervisors. In light of this, the articulated purpose of remedying past discrimination would not be a compelling governmental interest so as to justify the use of a racial classification in this case. Furthermore, the other objectives mentioned in this Opinion as possible

---

**13.** *See, Uzzell, et al v. Friday, et al,* 592 F.Supp. 1502, 1517 (M.D.N.C.1984); *J.A. Croson Compa-* *ny, et al v. City of Richmond,* 84–0021–R, 84–0022–R, p. 26 (E.D.Va. 12/3/84).

justification for the quota are not such as to satisfy the standard of a compelling governmental interest. *Fullilove, supra,* 448 U.S. at 498, 100 S.Ct. at 2785 (Powell, J., concurring). Mere practical or desirable ends are insufficient to justify a racial classification. *Palmore v. Sidoti, supra.*

Justice Powell stated in *Fullilove* that the cases establish that "even if the government proffers a compelling interest to support reliance upon a suspect classification, the means selected must be narrowly drawn to fulfill the governmental purpose." *Fullilove, supra,* at 498, 100 S.Ct. at 2785 (Powell, J., concurring). Along this line, Justice Powell suggested quite strongly in *Bakke* that the action of the Board of Regents would have passed constitutional muster had the Regents simply used race as a factor in granting or denying admission to medical school rather than establishing quotas. He pointed to the "Harvard Plan" as a workable example of a narrowly drawn means.[14] A like analogy can be made here, i.e. the SBSC could have taken race into account together with other factors in making School Board appointments rather than establishing the two-seat set aside. The SBSC is a totally independent body vested with complete discretion in making appointments. They are free to consider whatever characteristics, including race, that they deem relevant. A quota system certainly was not necessary. I am not prepared to say that using the race factor, as suggested by Justice Powell, would satisfy the constraints of the Equal Protection Clause because that would depend on the facts in each individual case. But I am prepared to say that taking race into account in such a fashion is far less objectionable from a constitutional perspective than is a racial quota system. As I indicated earlier the quota system is a two-edged sword and has the potential of other undesirable consequences.

An individual in this case has been denied an opportunity because of his race. The fact that he happens to be a member of a majority race is of little consequence from a constitutional perspective. The Constitution is a guarantor of personal rights, not class based or race based rights. Therefore, I find that even under the analysis enunciated by Mr. Justice Powell concurring in the opinions of *Bakke* and *Fullilove,* Peters rights were violated and that he has been denied equal protection of the law. This, however, does not necessarily entitle him to the damages as assessed by the jury, because as noted earlier in this Opinion, the Defendants have raised the defense of qualified immunity.

**D.  *Qualified Immunity Defense***

■  The decisions of the United States Supreme Court have consistently held that "[g]overnment officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from intentionally disabling threats of liability." *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). *See, Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). These cases, as well as others, stand for the proposition that "[e]ven defendants who violate constitutional rights enjoy qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard." *Davis v. Scherer,* —— U.S. ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984). The standard to be applied in a qualified immunity case is set forth in *Harlow v. Fitzgerald, supra,* and was reiterated in *Davis, supra.*

In *Harlow,* the Supreme Court held that "[g]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, supra,* 457 U.S. at 818,

---

**14.** For a more detailed discussion of the "Harvard Plan" see *Bakke, supra,* 438 U.S. at 316–324, 98 S.Ct. at 2761–66 (Powell, J., concurring).

102 S.Ct. at 2738. "Whether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.' ... *No other 'circumstances'* are relevant to the issue of qualified immunity." *Davis,* 104 S.Ct. at 3018 (emphasis added).[15]

■ Applying this standard to the case at hand, I find that the Defendant Moses has successfully established a qualified immunity defense. There is no question that Moses was a public official performing a discretionary function. It requires a giant exercise of imagination to conclude that Peters' rights under the Equal Protection Clause were rights of which a reasonable person would have known. The proof of this statement is in the fragmented opinions of the Supreme Court, both in *Bakke* and *Fullilove.*

An issue has been raised by counsel with regard to the consistency of the verdict returned by the jury. Specifically, the parties seek to have resolved a tension which exists between the jury's responses to Questions 2 and 3b of the Special Verdict. The specific language of these interrogatories are as follows:

> Question 2: "Did the Defendants have a good faith belief that it was legal to restrict the at-large seats on the School Board to blacks?"
>
> A: Yes.
>
> Question 3: "Assuming Peters' civil rights were violated by being denied consideration for the at-large School Board seat: (b) is he also entitled to punitive damages?"
>
> A: Yes.

The tension as alluded to by counsel is that it is impossible for a defendant to have acted in good faith so as to establish a qualified immunity defense and then be found to have acted in bad faith so as to justify the imposition of punitive damages.

In light of the qualified immunity standards set forth in *Harlow v. Fitzgerald, supra,* and reiterated in *Davis v. Scherer, supra,* Question 2 of the Special Verdict and its response are superfluous and have no real bearing on the defense of qualified immunity.

On the issue of punitive damages, the jury was instructed that the Plaintiff would be entitled to punitive damages if they should find that the Defendant acted willfully, *intentionally* or with careless and reckless indifference to the Plaintiff's rights. This was also the subject of a clarifying instruction. The jury was instructed further that they were required to find either ill will or a *willful intention* to violate the Plaintiff's rights based upon race. Furthermore, with regard to damages, the interrogatories were so phrased and the jury was instructed to assume that the Defendant had violated the Plaintiff's rights. Therefore, the jury never had to make the initial determination as to whether there was an actual violation of the Plaintiff's rights. For purposes of damages, they were to make this assumption. In light of these instructions, the verdict should be read as saying that the Defendant willfully intended to do what he did. Question 3 was posed to the jury to fix damages in the event that the Court determined that the Plaintiff's rights had been violated and there was no valid qualified immunity defense. At the time of the trial, these legal issues had not been decided by the Court.

The Clerk is directed to send certified copies of this Memorandum Opinion to all counsel of record.

---

15. This rejects the old view that the qualified immunity defense required a subjective as well as an objective element. "The objective element involves a presumptive knowledge of and respect for 'basic unquestioned constitutional rights.' *Wood v. Strickland,* 420 U.S. 308, 322 [95 S.Ct. 992, 1001, 43 L.Ed.2d 214] (1975). The subjective component refers to 'permissible intentions.' *Id."* *Harlow, supra,* 457 U.S. at 815, 102 S.Ct. at 2737.